UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT JAMES CLAUS and
SUSAN CLAUS,

Case No.: 03:16-CV-01509-AC

OPINION AND
ORDER

Plaintiffs,

v.

COLUMBIA STATE BANK,

Defendant.

_____

ACOSTA, Magistrate Judge:

*Introduction*

This suit arises from an ill-fated subdivision development project. Landowner Plaintiffs

Robert James Claus and Susan Claus (collectively, the "Clauses") sue their former lender,

Defendant Columbia State Bank ("Columbia"), alleging Columbia misrepresented the capitalization

and creditworthiness of the project's builder, Signature Homebuilders, LLC ("SHB"), and breached

the parties' construction loan contract. Currently before the court are Columbia's motion to dismiss all claims ("Motion"), ECF No. 14, and motion to strike portions of the Clauses' response to the motion to dismiss, ECF No. 24.[1] First, because the Clauses' response brief contains materials outside the pleadings, Columbia's motion to strike is granted. Second, because the Clauses' current complaint fails to state their claims under applicable pleading standards, Columbia's motion to dismiss is granted. However, the court also grants the Clauses leave to amend their complaint.[2]

*Background*

The following facts, as alleged in the complaint, are taken as true for purposes of the present motion to dismiss. Since the mid-1980s, the Clauses engaged in a business relationship with Columbia and its predecessor organizations, sharing a "long mutually beneficial business and building project history . . . ." (Compl. (ECF No. 1), Ex. 1, ¶ 5.) Four years ago, the Clauses decided to develop land they owned in Sherwood, Oregon as a residential subdivision with eight houses. (Compl. ¶ 6.) In July 2013, the Clauses approached Columbia to help finance the project, and the bank issued the Clauses a conditional $900,000 revolving line of credit. (Compl. ¶ 6.)

In the months that followed, Columbia, as the Clauses allege, "controlled the [loan] application process," which included a credit analysis of the Clauses, property appraisal, and project analysis. (Compl. ¶ 7.) As part of the project analysis, Columbia conducted "an extensive confidential review of the proposed builder," SHB, examining its "members, their projects, their

---

[1] Columbia requested oral argument in their Motion. The court finds this motion appropriate for disposition without oral argument pursuant to Local Rule of Civil Procedure 7-1(d)(1) and denies the request.

[2] The parties have consented to jurisdiction by magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

business, and credit." (Compl. ¶ 8.) The information gleaned in the analysis was deemed "trade

secret," and thus withheld from the Clauses. (Compl. ¶ 8.)

An employee of Columbia, Kelly White ("White"), "assured [the Clauses] that [Columbia's]

commercial loan department had vetted SHB, finding that SHB had strong credit and adequate

capitalization." (Compl. ¶ 10.) Columbia also "wanted to use SHB because they were a turnkey

builder[3] who could get occupancy permits for specified prices with[in] 120 days of starting a house."

(Compl. ¶ 10.) Columbia, therefore, "insisted upon" hiring SHB for the job. (Compl. ¶ 8.) Though

the Clauses allege they already "had a preferred general contractor," and were approached by at least

three others for the project, they agreed to engage SHB as the general contractor for the project.

(Compl. ¶¶ 8, 29–30.)

The loan closed in October 2013, secured by a first trust deed on the property in Columbia's

favor and executed through a Construction Loan Agreement (the "Loan Agreement" or

"Agreement"). (Compl. ¶ 6; *See* Declaration of Stanley M. Cruse in Support of Def.'s Mot. to

Dismiss ("Cruse Decl."), Ex. 1.) The Agreement outlined several scenarios that would constitute

default events under the contract, including the Clauses' failure to make loan payments or any

"creditor or forfeiture proceedings" against the loan's collateral. (Agreement at 6.)

The parties agreed that Columbia would monitor both the credit line and SHB, to ensure the

property remained lien free during construction. (Compl. ¶ 9.) Funds from the loan were to be

dispersed to SHB through Columbia's accounting program, and Columbia was responsible for

obtaining invoices and proof of payment from SHB as well as preparing on-going lien releases as

---

[3] A builder that constructs projects for immediate use without securing a buyer in advance, also known as a speculative, or "spec," builder. *Turnkey*, AMERICAN HERITAGE DICTIONARY 1872 (5th ed. 2010).

various aspects of the project were completed.  (Compl.  ¶ 12.)

The project commenced but, in April 2014, fell behind in its intended timeline after SHB failed to deliver on time an occupancy certificate for one home and delayed construction on another. (Compl.  ¶ 14.)  Additionally, though SHB was required to advance payments on all necessary permits, the Clauses allege they were ultimately forced to make those payments.  (Compl.  ¶ 14.) Still, the project continued.

The Clauses also claim that on or around April 2017, a construction contract for lot 4 on the property was executed without either of the Clauses' signature.  (Compl. ¶ 15.)  They allege that SHB, and perhaps also Columbia, "used a forged signature" to execute the contract.  (Compl. ¶ 15.)

In July 2014, Columbia informed the Clauses that one of SHB's subcontractors had filed a notice of lien against the property's home lots, claiming it never was paid for supplies delivered. (Compl. ¶ 16.)  Three other subcontractors also recorded liens, claiming they, too, had not been paid. (Compl. ¶ 16.)  The Clauses later discovered that instead of paying the subcontractors, SHB had "walked away" and kept the Clauses' funds.  (Compl. ¶ 21.)

On August 22, 2014, Columbia received a writ of garnishment against the Clauses' Columbia account. (Compl. ¶¶ 17–18.)  The writ stemmed from a default judgment entered erroneously against the Clauses in an unrelated legal action due to legal malpractice by the Clauses' then attorney. (Compl. ¶¶ 17–20.)  With the help of the Oregon Professional Liability Fund, the default judgment was corrected and set aside in December 2014, but the associated liens "were not removed in a timely manner."  (Compl. ¶ 20.)  The Clauses allege Columbia "then told [the Clauses] that their construction loan would be frozen until the lien issues were resolved and that [they] would have to make monthly interest payments until resolution," but it is unclear whether the Clauses refer to the

subcontractor liens or the liens associated with the erroneous writ of garnishment.  (Compl. ¶ 17.)

In September 2014, the four unpaid subcontractors filed foreclosure actions on their liens. (Compl.¶ 21.)  Columbia, also a named party to that suit, filed its own claims against the Clauses, for breach of the Agreement and, based on the liens associated with the writ of garnishment, to foreclose on the Clauses' property that served as collateral for their construction loan.  (Compl. ¶ 21.)

As alleged in the Complaint, as a result of SHB's construction delays, the Clauses had to make interest payments on their loan for five more months than they had anticipated, had SHB met its obligations.  (Compl. ¶ 14.)  Based on either the subcontractor liens or the erroneous garnishment writ liens, the Clauses' construction loan with Columbia was frozen, which "forced them to borrow $150,000 from another source" to finish houses that had been only partially completed.   (Compl. ¶ 20.)  When SHB walked away from the project, it took with it "more than $85,000 in construction funds" and left the Clauses "as the responsible party" for over $65,600 in "outstanding balances owed to" at least three subcontractors.  (Compl. ¶ 21.)  The Clauses also allege they incurred legal costs to defend the foreclosure actions and the erroneous writ and "appraised monetary loss from selling the houses in bulk at below-market value." (Compl. ¶ 22.)  Robert Claus also claims to have suffered "severe physical and mental pain as a result of having to finish some of the work on the Subdivision homes himself in order to mitigate damages[,]" and "further mental pain due to the anxiety of not being able to provide" financially for his family.  (Compl. ¶ 31.)

The Clauses filed suit in state court on June 22, 2016, asserting claims of fraud, negligence, and breach of contract under state law, seeking economic and non-economic damages and equitable relief.  (Compl. ¶¶ 23–38.)  Specifically, the Clauses allege Columbia fraudulently and negligently

falsely represented the creditworthiness and extent of capitalization of SHB, and that they relied on that representation to their detriment. (Compl. ¶¶ 24–36.) They also claim Columbia breached the parties' Loan Agreement by wrongly initiating foreclosure. (Compl. ¶ 38.)

Columbia timely removed to federal court, based on diversity jurisdiction. Columbia now moves to dismiss the Clauses' complaint for failure to state all three claims and, additionally, challenges the fraud claim lacks the required particularity.

*Legal Standard*s

Federal Rule of Civil Procedure ("Rule") 8(a) governs pleadings and calls for "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." FED. R. CIV. P. 8(a). The Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), addressed the pleading standard required to adequately state a claim under the Federal Rules of Civil Procedure. The Court emphasized the need to include sufficient facts in the pleading to give proper notice of the claim and its basis. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (brackets omitted). Even so, the court noted that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). A court considering a motion to dismiss must draw all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

Since *Twombly*, the Supreme Court has made clear that the pleading standard announced

therein is generally applicable to cases governed by the Federal Rules of Civil Procedure, not just those cases involving antitrust allegations. As the Court held in *Twombly*, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555) (internal citations omitted); *see also Villegas v. J.P. Morgan Chase & Co.*, No. C 09–00261 SBA, 2009 WL 605833, at *3 (N.D. Cal. Mar. 9, 2009) ("The *Twombly* standard, moreover, is of general application and is as easily applied to wage and hour litigation as antitrust."). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

Finally, courts generally have a duty to construe *pro se* pleadings liberally and "afford the [*pro se*] plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 623 (9th Cir. 1988); *accord. Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (internal citations and quotations omitted)). This duty applies to both *pro se* complaints and *pro se* motions. *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 925 (9th Cir. 2003).

Here, the Clauses were represented by counsel at the time their complaint was filed, and the complaint was drafted by their then attorney. That attorney since has withdrawn, and the Clauses have filed *pro se* their opposition brief to Columbia's Motion. Therefore, although the Clauses'

complaint, drafted by a lawyer, warrants no special leniency, their *pro se* opposition brief is liberally construed and afforded the benefit of any doubt.

*Preliminary Procedural Matter*

In support of their opposition to Columbia's Motion, the Clauses submitted to the court numerous, voluminous evidentiary exhibits. (*See* ECF No. 22, Exs. 1–19.) Columbia moves to strike these materials as redundant and immaterial. (Def.'s Motion to Strike Portions of Pls.' Resp. ECF No. 24, at 2.)

Generally, on a motion to dismiss for failure to state a claim, the court may consider only the pleadings themselves, exhibits that are physically attached to the complaint, and matters of which the court may take judicial notice. *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam). Materials outside the pleadings may not be considered in ruling on a motion to dismiss unless the motion is treated as one for summary judgment and the parties are "given reasonable opportunity to present all materials made pertinent to such motion by Rule 56." *Jacobson v. AEG Captial Corp.*, 50 F.3d 1493, 1496 (9th Cir.1995). A document is not considered "outside" the complaint if the complaint specifically refers to the document, its authenticity is not questioned, and the plaintiff's complaint necessarily relies on it. *Id*. at 774.

Columbia's Motion to Dismiss is properly brought against the pleadings alone. The Loan Agreement is not considered outside of the pleadings because the Clauses' complaint specifically refers to and necessarily relies on it, and neither party challenges its authenticity. Thus, the court finds no reason treat the Motion as one for summary judgment. Accordingly, because the court may not look to materials outside the pleadings, Columbia's motion to strike the Clauses' outside materials is granted. However, this grant in no way precludes the Clauses from referring to or

resubmitting these exhibits at a later, appropriate juncture, such as at a summary judgment stage or at trial, should the case so progress.

*Discussion*

I.    First Claim for Relief – Fraud.

    A.    Particularity.

Columbia argues the Clauses fail to state factual allegations to support their fraud claim with the requisite particularity. Specifically, it contends the complaint lacks sufficient detail regarding the alleged fraudulent representations made about SHB's capitalization and creditworthiness.

Rule 9(b) supplements Rule 8 and imposes a heightened pleading standard for fraud claims, requiring that such claims be pled "with particularity." FED. R. CIV. P. 9(b). Courts have interpreted that standard to require that the complaint specify the "who, what, when, where, and how of the misconduct charged." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation omitted). The particularity requirement furthers three policy interests: (1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints "as a pretext for the discovery of unknown wrongs"; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)). In federal court, the substantive elements of a state law fraud claim are determined by state law, but those elements still must be pleaded with particularity as required by Rule 9(b). *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1104–05 (9th Cir. 2003).

The Clauses' fraud claim alleges that, at some point in 2013, Columbia, through its agent, White, "made a representation . . . that SHB and each of its members had strong credit and adequate capitalization when [the Clauses] inquired about [Columbia]'s vetting of SHB as the general contractor for the Subdivision homebuilding." (Compl. ¶ 24.) That representation, according to the Clauses, was false because "SHB was found to be an undercapitalized LLC" and some of its members were in fact "in personal bankruptcy," their company "valueless." (Compl. ¶ 25.) Thus, the complaint sufficiently pleads the "who" and, vaguely, the "what" elements required by Rule 9(b), but fails to articulate when, where, or how, that is, by what means, the statement was made. The complaint likewise fails to provide adequate particularity with respect to the details of what exactly White represented about SHB's capitalization and credit. Based on the current allegations in the complaint, Columbia is not afforded adequate notice to allow it to defend against the accusation. Without more, the fraud claim does not comport with Rule 9(b)'s heightened pleading requirement.

B.     Failure to State a Claim.

Columbia also challenges the Clauses' fraud claim under Rule 12(b)(6) on the ground it fails to state a claim upon which relief may be granted, that is, that the complaint fails to allege the necessary elements of a fraud claim.

The elements of an Oregon common-law fraud claim are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the listener in the manner reasonably contemplated; (6) the listener's ignorance of the representation's falsity; (7) the listener's reliance on the truth of the representation; (8) the listener's right to rely thereon; and (9) the listener's consequent and proximate injury. *Webb v. Clark*, 274 Or. 387, 391 (1976). Embedded in that list

is the requirement that the defendant made the representation at issue "with knowledge of its falsity and with the purpose of or knowledge that he was misleading the defendant." *McMullin v. Murphy*, 89 Or. App. 230, 233 (1988) (citing *U.S. National Bank v. Fought*, 291 Or. 201, 220–25 (1981)). Each of these elements must be established by "clear and convincing evidence." *Webb*, 274 Or. at 391. Clear and convincing evidence means that the truth of the facts asserted is highly probable. *Coy v. Starling*, 53 Or.App. 76, 80 (1981).

Accordingly, to state a claim for fraud, the Clauses must allege that Columbia made false representation with the intent that they rely on that representation, that the Clauses were unaware of the falsity of the representation, and that they justifiably relied on the representation to their actual and proximate detriment. Columbia challenges specifically the latter two premises: that the Clauses' reliance on its representation was not justifiable and that the representation was not the proximate cause of their damages.

### 1. *Proximate Cause.*

Columbia argues the Clauses fail to allege sufficient proximate cause between the representation made and the damages incurred. It contends that even if its representation about SHB was false, the damages resulting from SHB's failure to pay its subcontractors are too attenuated to be attributed to Columbia. Columbia specifically notes the Clauses allege only that the representation caused them to hire SHB, not that the representation caused SHB's failure to pay subcontractors, which is what ultimately led to the liens being filed and, consequently, the Clauses' foreclosure.

To state a claim for fraud under Oregon law, a plaintiff must show the allegedly fraudulent conduct proximately caused his or her damages. *Knepper v. Brown*, 345 Or. 320, 330 (2008).

Proximate cause in this context, like in negligence, means the injury in question is "reasonabl[y] foreseeab[le]" from the conduct. *Id*. ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from . . . reliance upon it *if, but only if, the loss might reasonably be expected to result from the reliance.*") (emphasis in original) (quoting Restatement (Second) of Torts § 548A (1977)). This foreseeability inquiry "appropriately recognizes that the scope of liability for an intentional, fraudulent misrepresentation depends on the nature of the misrepresentation, the audience to whom the misrepresentation was directed, and the nature of the action or forbearance, intended or negligent, that the misrepresentation justifiably induced." *Id*. The Oregon Supreme Court also has noted that "when an intentional tort is involved, the range of legal causation can be quite broad," and can encompass "even very remote causation." *Id*. (internal quotation omitted).

For example, in *Knepper*, a doctor board-certified in dermatology, but not plastic surgery, placed an ad in a phonebook. *Id*. at 323–24. At the urging of the phonebook's sales representative, the ad referred to the doctor's board certification without specifying the area of certification. *Id*. The ad was then listed under a "plastic and reconstruction surgery" heading in the phonebook, which led Knepper, who was contemplating getting plastic surgery, to assume the doctor's certification pertained to that field. *Id*. Months later, Knepper attended a trade show and came upon a booth offering information about plastic surgery, including the doctor's brochure, which specifically and erroneously, stated he was certified in plastic surgery. *Id*. at 325. Knepper was also later told by an employee of the doctor and the doctor himself that he was indeed certified in plastic surgery. *Id*. Knepper hired the doctor to perform liposuction, suffered complications from the procedure, and sued the doctor and the phonebook, alleging both had fraudulently represented the doctor's credentials. *Id*.

The phonebook defended that its representation was not the proximate cause of Knepper's injuries. *Id.* Applying its "foreseeability principle" to the case, the Oregon Supreme Court concluded Knepper's "damages reasonably might [have] be[en] expected to result from [] reliance on [the phonebook]'s misrepresentation." *Id.* at 331. The doctor's and his employee's similar misrepresentations were not intervening causes that broke the chain of proximate cause. *Id.* Rather, the ad, which "misrepresent[ed] a medical provider's qualifications[,] self-evidently create[d] a risk that a consumer who seeks treatment from the provider in reliance on that misrepresentation will suffer an adverse result that would not have occurred if the provider's qualifications had been as represented." *Id.* Despite that Knepper hired the doctor months after reading the phonebook ad and only after directly receiving at least two other, more inaccurate representations regarding his qualifications, Knepper's injuries "fell precisely within the foreseeable risk of harm that misrepresentation created . . . ." *Id.*

This court previously has applied *Knepper* to conclude that a plaintiff adequately pleaded proximate cause to support a fraud claim under Oregon law. In *Expedite, Inc. v. Plus, Bags, Cars & Serv, LLC*, No. CIV. 11-329-AC, 2013 WL 1700948, at *6 (D. Or. Apr. 18, 2013), a defendant-sourcing agent facilitated a bidding process under which airport baggage delivery vendors would bid on contracts to service various airlines. *Id.* at *1. The agent initially represented that all vendors competed for the baggage delivery contracts under the same criteria. *Id.* The agent was later purchased by a larger corporation with multiple subsidiaries, one of which was another baggage delivery company. *Id.* Under new corporate ownership, the agent notified the baggage vendors that under its "new program," the bidding process would include new criteria, but did not disclose that one of the vendors with which existing vendors would now be competing was its own subsidiary.

*Id*. at \*2.  Thus, the agent now controlled "both ends of the bidding process" and could use the other vendors' business information to underbid and outcompete them.  *Id.*

An existing vendor sued and the agent moved to dismiss, arguing it had not proximately caused the vendor to lose any contracts and that the damages alleged were too speculative.  *Id.* at \*5.  The court disagreed, reasoning that "[l]ike the [phonebook's] posting in *Knepper* that held out the dermatologist as a board-certified plastic surgeon, [the agent] held out in its communications that the bidding process would be fair." *Id.* at \*6.  Thus, it was "reasonably foreseeable that [the baggage company], had it known of the rigged bidding process, would have notified the airlines of the irregularities it allege[d] and attempted to negotiate directly with the airlines."  *Id*.

Applying Oregon's broad conception of proximate cause as articulated in *Knepper* to the facts of this case, and drawing all reasonable inferences in favor of the non-moving plaintiffs, the Clauses have adequately pleaded the element of proximate cause with respect to their fraud claim.  Columbia held out that SHB was creditworthy and sufficiently capitalized, and, according to the complaint, "insisted" the Clauses use SHB if they wanted the loan.  Notwithstanding whether reliance on the representation was justifiable (discussed *infra* in part II.2), here, like the misleading ad in *Knepper*, misrepresenting SHB's financial status self-evidently created a risk that hiring SHB would induce the adverse result that SHB would misuse the Clauses' funds.  And, under the reasoning in *Expedite, Inc*., it is reasonably foreseeable that the Clauses, had they known of SHB's poor credit and capitalization, instead would have pursued another builder.

Columbia's argument that its representation did not in fact cause SHB to take the Clauses' money yet fail to pay its subcontractors misconstrues the requisite proximate cause analysis.  The question is not why SHB failed to pay the contractors; it is whether the damages caused by that

failure fell within the foreseeable risk of harm its representation created. With respect to their fraud claim, the Clauses allege money damages including those related to being forced to sell the land below appraised value and to sell bare lots facing pending foreclosure by Columbia rather than fully developed homes, out-of-pocket costs to complete and prepare some of the homes, and foreclosure and lien expenses and accompanying attorney fees. (Compl. at 12.) These damages are all within the scope of potential harm that hiring a financially untrustworthy builder might cause. In addition to the direct economic losses the Clauses incurred as a result of SHB's failings, Columbia's foreclosure action appears to be based at least in part on the subcontractors' liens, liens that resulted from SHB's failure to pay the subcontractors. Therefore, the Clauses' injuries fell precisely within the foreseeable risk of harm that misrepresentation created.

Columbia also argues the Clauses' "own failure to pay SHB or perform under [their] contracts with SHB" is an "equally possible" intervening cause. (Motion at 10.) That argument runs contrary to Oregon courts' broad construct of proximate cause. The phonebook ad at issue in *Knepper* was only one of three fraudulent representations that induced Knepper to hire the doctor. The other two — the brochure and the doctor's employee's statements expressly and falsely touting the doctor's plastic surgery certification — were both closer temporally to the injuries and more egregious than the ad. Yet neither of those causes were enough to constitute an intervening cause. Here, there does not appear to be any analogous alternative or additional cause. Despite Columbia's general argument, nothing before the court suggests the Clauses failed to pay SHB or failed otherwise to perform under their contracts with SHB. Moreover, Columbia's intervening cause argument ignores the pleaded damages induced by the foreclosure actions initiated by the subcontractors, the reduced property values, the out-of-pocket costs and the legal fees. Again, in

accordance with Oregon law, even remote causation is sufficient in the context of the intentional tort of fraud. Thus, the Clauses' fraud claim sufficiently states proximate cause.

### 2. *Justifiable Reliance.*

With respect to justifiableness, the Clauses allege simply that their "rights to rely on [Columbia]'s representation were not limited contractually, statutorily, or otherwise." (Compl. ¶ 29.) Columbia argues that this allegation merely states the absence of any limitation on the Clauses' right of reliance; it does not affirmatively state that the Clauses had the actual right to rely on the representation. Columbia is correct that the mere fact that the Clauses' right to rely on its representation was not limited does not establish a right to rely on the representation existed. But neither does it establish that such a right did not exist.

The "right to rely," or justifiableness, element of a fraud claim under Oregon law requires that the plaintiff's reliance be reasonable under the totality of the circumstances. *Oregon Pub. Employees' et. Bd. ex rel. Oregon Pub. Employees' Ret. Fund ("OPERB") v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 428 (2004). "The standard for assessing reasonable reliance varies depending on the specific circumstances of the parties' relationship." *Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or. App. 469, 483(2009). As the Oregon Court of Appeals explained,

> reasonableness is measured in the totality of the parties' circumstances and conduct. For example, if there is a naive and unsophisticated plaintiff on one side of the equation and an unscrupulous defendant who made active misrepresentations of fact on the other, a court might well conclude that, although a more sophisticated party would not have taken at face value the false representations of the defendant, that particular plaintiff was justified in doing so.

*OPERB*, 191 Or. App. at 428.

*Coy v. Starling*, 53 Or. App. 76, *rev. den.*, 291 Or. 662 (1981) is instructive. There, a

plaintiff-buyer of a motel sued the seller, the motel's former owner, for fraud based on a misrepresentation about the motel's annual gross income and expenses. *Coy v. Starling*, 53 Or. App. at 81. The court held the buyer's reliance on the seller's representation was not justified, noting that the case involved an arm's-length transaction and that the buyer was familiar with accounting and bookkeeping, yet declined to examine the records that had been offered and provided by the seller. *Id.* Moreover, the buyer knew the seller had owned the motel for less than a year and thus knew that the representation of annual gross income could have been only an estimate. *Id.* Therefore, the seller's representations were mere expressions of opinion on which a buyer should not have relied, particularly when the buyer "'ha[d] or c[ould] obtain equal means of information and [was] equally qualified to judge certain factors claimed to contribute to the value of the property . . . .'" *Id.* at 81–82 (some citations omitted) (citing *Gregory v. Novak*, 121 Or. App. 651, 655 (1993) ("Justifiable reliance requires a 'right to rely,' which is acquired by taking reasonable precautions to safeguard one's own interests.")).

Nor was reliance justified in *Vasquez-Lopez v. Beneficial Oregon, Inc*., 210 Or. App. 553, 580 (2007). The Vasquez-Lopezes, who spoke only Spanish, sought to refinance their home and applied for a loan, providing supporting documentation. *Id*. at 557–58. They later sued their mortgage company after it disclosed unfavorable terms of the loan only in English. *Id*. at 558. The company asserted fraud as an affirmative defense, alleging that the couple had provided it with inaccurate tax returns and thus fraudulently induced the loan. *Id*. at 559. The court evaluated whether the company had a right to rely on the returns by weighing the parties' relative sophistication. *Id*. at 580. The company was "a sophisticated organization that employ[ed] underwriters whose job includes reviewing loan applications for misrepresentation," with a policy

in place for dealing with suspect returns. *Id.* The company also "had sufficient resources at its disposal to detect any existing liabilities plaintiffs had not disclosed either in their loan application or in their conversations with defendant's representative." *Id.* at 581 (alterations omitted). Therefore, the company's reliance on the returns was unreasonable. *Id.*

Conversely, reliance was reasonable and thus justifiable in *Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or. App. 469, 473 (2009). FedEx hired Wieber as a subcontractor to deliver packages within a certain service area for a period of three years. *Id.* at 472. Under their subcontractor agreement, Wieber was responsible for furnishing and maintaining its own fleet of delivery vehicles, overseeing its own staff, and managing its own operations in accordance with FedEx's guidelines, and in return, Wieber was granted certain proprietary interests in Fedex's customer accounts. *Id.* Weiber's customer service deteriorated and, anticipating its subcontract soon would be terminated, Wieber asked a FedEx manager whether and how much advance notice it would receive prior to termination. *Id.* at 473. Despite Fedex's policy not to provide any advance notice of subcontractor termination, the manager replied, "usually 30 to 45 days." *Id.* Weiber was terminated, without notice, two months later. *Id.* Wieber sued for fraud, and FedEx argued the subcontractor had no right to rely on the manager's statement. *Id.* at 481. The court, viewing the facts in the light most favorable to Wieber, held that a jury "reasonably could have found that, even if a more sophisticated party would not have relied on [the manager]'s statement, [Wieber] — who appeared to rely solely on FedEx's guidance to understand FedEx's policies regarding [Wieber]'s rights to sell their proprietary interests and FedEx's termination procedures — were justified in so relying on [the manager]'s statement." *Id.* at 484.

The relative sophistication of the parties, and accordingly, the justifiableness of Clauses'

reliance on Columbia's representation falls in between *Coy, Vasquez-Lopez,* and *Weiber*. The Clauses are less sophisticated as relates to their reliance than was the mortgage company in *Vasquez-Lopez*, which not only had significant commercial resources but also was in the specific business of evaluating the creditworthiness of its loan applicants. But they likely had less justification to rely on the representation than did Weiber in his case, who relied on a representation that was contrary to existing policy and regarded an active contract, through the direct word of his general contractor.

*Coy* is most apt, as the Clauses' Loan Agreement represented an arm's-length transaction, and the Clauses were at least familiar, if not experienced, with real estate, lending, development, and construction processes. By the Clauses' own description, the parties shared a long project history. However, unlike the seller in *Coy*, which, due to the short time it owned the motel, had only a limited ability to ensure the accuracy of its representation, Columbia had no such limitation on its ability to gauge SHB's creditworthiness or capitalization, indeed, the Clauses allege Columbia withheld such information from them under cover of trade secret. Thus, the Clauses, unlike the buyer in *Coy*, would have less reason to believe the representation in question was a statement of mere opinion. Additionally, the Clauses, much like the buyer in *Coy*, failed to heed publically available records highly relevant to their own ability to pay back their loan. The Clauses reference that very information in their complaint. (Compl. ¶ 25) (stating "one look at U.S. Bankruptcy Court records . . . would have revealed that all three SHB principals filed for and were granted Chapter 7 bankruptcy protection . . . " and pointing to "Oregon Secretary of State business records" and "Oregon Construction Contractors Board" records).

The Clauses acknowledge they retain "core knowledge" about the construction field but note

they have been in a "semi-retired" state for the past eight years, and therefore relied on Columbia as their "expert" in construction loan matters. (Pls.' Resp. Br. (ECF No. 22), at 31.) They also argue that despite the relevant publically available records about SHB, only Columbia had access to several "critical" confidential documents including SHB's business references, bids, and other subcontractor information. (Compl. ¶ 8.)

These allegations, however, are inadequate to support the justifiable reliance element of the Clauses' fraud claim. At most, the allegations explain why the Clauses subjectively felt entitled to rely on Columbia's representation alone. The allegations do not, however, show that the Clauses' reliance was reasonable based on the specific circumstances of the parties' relationship, as required under Oregon law. Still, the court cannot conclude that amendment could not cure these deficiencies. Based on other allegations in the complaint, surrounding the Clauses' longstanding business relationship with Columbia, it is possible the Clauses' reliance was justified on some other ground, for example if the parties' relationship reached beyond that of a typical lender-borrower arrangement. It may be unusual for a lender to suggest a general contract for a project it merely finances or to "volunteer to monitor both the credit line and SHB . . . ." Or if, as *OPERB* and *Wieber* suggest, Columbia gave the Clauses reason to rely solely on its financial due diligence, for example, if it had affirmatively assured them the bank alone was responsible for the credit check or if the parties had a similar arrangement in the past, then the situation might be different. But *Twombly* and *Iqbal* require plausible, not just possible, claims and, without more, the Clauses fail to allege their reliance on Columbia's representation was reasonable based on the facts currently alleged.

### 3. Knowledge or Purpose.

Additionally, though Columbia does not argue as much, the Clauses also fail to state that

Columbia had the requisite knowledge or purpose to commit the intentional tort of fraud. Under *McMullin* and *U.S. National Bank*, the Clauses must allege that Columbia both knew its representation was false and made the representation with the purpose to, or at least the knowledge the representation would, mislead the Clauses.

The Complaint alleges only that Columbia, through its agent, White, "knew or should have known that representation" was false, and "knew that by telling the Clauses . . . about SHB's credit, they would rely on [the] representations . . . ." (Compl. ¶¶ 27–28.) Those conclusory allegations are insufficient to state the requisite intent for fraud for two reasons.

First, the formulaic recitation misstates the elements of fraud. It is not enough that Columbia "should have known" its representation was false; it actually must have known the representation was false.

Second, the Clauses provide no factual allegations to support that Columbia in fact knew its representation about SHB was false. And logically, absent evidence of some ulterior motivation, it makes little sense for a bank to approve a financially untrustworthy general contractor for a project when the success of that project, and ipso facto, the likelihood of loan repayment, hinges in large part on that contractor's financial stability. Were Columbia to have known that SHB might be financially unsound, it would have little incentive even to suggest the contractor, let alone to extend funds for the project. The Clauses provide no allegations that plausibly suggest why Columbia would act so contrary to its own business interests. Moreover, Columbia could not have known, much less intended, that its representation would misled the Clauses if the bank itself did not know the statement was false.

As such, the fraud claim, as stated, falls short of the *Twombly* and *Iqbal* standard and fails

plausibly to give rise to an entitlement to relief above a speculative level.

II.     Second Claim for Relief – Negligence.

The Clauses allege Columbia acted negligently and breached its duty of reasonable care by "insisting upon using a bankrupt general contractor for a valuable construction and home sale project or by failing to recognize that all three members of SHB were recently bankrupt," which caused the Clauses to suffer "economic injuries-in-fact of $5,000,000." (Compl. ¶ 36.) That harm, the Clauses allege, "was a reasonably foreseeable consequence of selecting an uncreditworthy general contractor like SHB or failing to discover" that SHB or its members were uncreditworthy." (Compl. ¶ 36.)

To survive a motion to dismiss in Oregon, a plaintiff seeking to recover for negligence must "allege facts from which a factfinder could determine (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was the cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent." *Graham v. Multnomah Cty.*, 158 Or. App. 106, 109–110 (1999) (citing *Solberg v. Johnson*, 306 Or. 484, 490–91 (1988)).

When the damages alleged in connection with negligence are economic in nature, a plaintiff must also establish "some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149, 159 (1992) (en banc). This limitation on recovery, termed the "economic loss doctrine," rescinds a defendant's liability for "negligently causing a [plaintiff]'s purely economic loss without injuring his person or property," unless that plaintiff "can show some source of duty outside

the common law of negligence, such as a special relationship or status that imposed a duty on the defendant beyond the common-law negligence standard." *Harris v. Suniga*, 344 Or. 301, 308 (2008) (internal alteration and citation omitted). For purposes of the economic loss doctrine, "economic losses" are characterized as "financial losses such as indebtedness incurred and return of monies paid, as distinguished from damages for injury to person or property." *Onita Pac. Corp.*, 315 Or. at 159 n.6; *see e.g., Harris*, 344 Or. at 310 (holding economic loss doctrine did not apply because defendant's negligence caused building dry rot damage, which was not solely economic damage).

If the economic loss doctrine applies, to recover, a plaintiff must "show the existence of a special relationship in which the defendant had some obligation to pursue the plaintiff's economic interests." *Roberts v. Fearey*, 162 Or. App. 546, 550 (1999) (citing *Conway v. Pacific University*, 324 Or. 231, 237 (1996). Whether such a relationship exists depends on "the nature of the parties' relationship and compare[s] that relationship to other relationships in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship." *Onita Pac. Corp.*, 315 Or. at 160. Supporting factors include: "(1) One party relinquishes control over matters, usually financial, and entrusts them to the other party; (2) The party with control is authorized to exercise independent judgment; (3) in order to further the other party's interests; and (4) The relationship either is, or resembles, other relationships in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship." *Hettle v. Constr. Contractors Bd.*, 260 Or. App. 135, 147 (2013) (internal alterations omitted) (quoting *Bell v. PERB*, 239 Or. App. 239, 249–50 (2010), *rev. den.*, 350 Or. 230 (2011)).

Illustrative is *Onita*, in which a defendant-seller, one party of many to a complex property sale transaction, represented to the plaintiff- buyer, that certain deeds would be released to the buyer

as soon as payment was made. *Id.* at 154. The subsequent contract documenting the transaction, however, contained no such representation, and instead provided that the deeds would be released only upon resale. *Id.* The buyer later sued for negligent misrepresentation and sought only economic damages. *Id.* at 155. The Oregon Court of Appeals rejected the claim, noting that although professional or contractual relationships in which one party is "acting to further the economic interests of a "client," may "give rise to a tort duty to exercise reasonable care on behalf of another's interests[,]" "adversarial parties negotiating at arm's length to further their own economic interests" owe one another no such duty. *Id*. at 160–61. "[A]llowing recovery for negligent misrepresentations made in the bargaining process would undermine the law of contracts, especially rules of law concerning written contracts." *Id*. at 162. Therefore, the court held that "in arms-length negotiations, economic losses arising from a negligent misrepresentation are not actionable." *Id.* at 161–62.

Under Oregon law, absent special circumstances, loan contracts represent arm's-length transactions, and creditor-debtor relationships do not impose a fiduciary or higher standard of care. *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp*., 320 Or. 638, 650 (1995); *see also Hogan v. NW Tr. Servs., Inc.*, No. 10-6027-HO, 2010 WL 1872990, at *9 (D. Or. May 7, 2010), *aff'd*, 441 F. App'x 490 (9th Cir. 2011) (explaining "long-held Oregon legal principles that, arms-length banking and loan transactions do not constitute a special or fiduciary relationship"). "To establish a fiduciary relationship there must be some standard of care [additional and] apart from th[at] imposed by a loan agreement." *Hogan*, 2010 WL 1872990, at *9 (citing *Uptown Heights Assocs. Ltd. P'ship*, 320 Or. at 650.)

The Oregon Supreme Court examined the relationship between borrower and lender in

*Uptown Heights Assocs. Ltd. P'ship*, and concluded even a "special relationship of trust and confidence" between a borrower and a bank, including a bank's "aggressive sales tactics" or "assurances to [a borrower] that [the bank] want[s] [the borrower] to succeed]" and that the bank "would work with [the borrower] to make [a] project a success," are insufficient to trigger a heightened standard of care independent of contractual duties imposed by a loan agreement. *Uptown Heights Assocs. Ltd. P'ship*, 320 Or. at 648–50. The court did, however, suggest that "parties' . . . past course of dealing [if it is] itself of a fiduciary nature," in theory could suggest a higher, fiduciary standard of care on the part of a lending bank. *Id*. at 650.

The Oregon Court of Appeals, too, has considered the borrower-lender relationship, addressing a lender's common law duty of reasonable care to disburse funds in conjunction with a construction loan. *Thormahlen v. Citizens Sav. & Loan*, 73 Or. App. 230, 233 (1985). The court discussed the "majority rule" that

> no duty is imposed upon a lender of a construction loan to exercise reasonable care in its inspection of the borrower's premises, even where the borrower pays the lender's inspection fee, unless the lender voluntarily undertakes to perform such inspection on behalf of and for the benefit of the borrower. . . . Because the lender may exercise its independent right of inspection for its exclusive benefit, and thus incur no liability to the borrower for its negligent inspection, the burden is on the borrower, seeking to impose liability, to prove the lender's voluntary assumption of activities beyond those traditionally associated with the normal role of a money lender.

*Id*. The court therefore held that a construction lender had no duty to inspect the construction work before disbursing funds, primarily because "inspections by construction lenders to determine the percentage of completion of the work before disbursing funds are undertaken to ensure that the lender's security is protected adequately, not to provide technical assistance to the borrower . . . ." *Id*. at 240. "[I]n the absence of the lender[] agreeing to go beyond its ordinary function in making

inspections, the borrower must look elsewhere for the protection it desires." *Id.* at 240–41.

The economic loss doctrine applies here. With respect to their negligent misrepresentation claim, the Clauses seek only "economic injuries-in-fact of $5,000,000," which comprises legal costs, costs to finish the partially-constructed homes to prepare for sale, appraised monetary loss from being forced to sell the homes at bulk and below market value. (Compl. ¶¶ 22, 36, 38.) Unlike the physical property damage in *Harris*, the damages the Clauses' allege, like the indebtedness, additional monies owed, and loss of appraised market value contemplated in *Onita*, are economic in nature. Though the Clauses seek "noneconomic damages for pain and suffering" in conjunction with their fraud claim, they do not include such damages in their prayer for relief on their negligence claim. (Compl. ¶ 38.)

Even if the Clauses had included those non-economic damages, which allegedly stem from Robert Claus having to perform some of the construction himself and anxiety from the financial loss, in conjunction with their negligence claim, those damages are too attenuated to bring their claim outside of the economic loss doctrine. The Oregon Court of Appeals has held "mental distress" damages are not recoverable in a negligence action alleging no physical injury, reasoning,

> it is difficult to imagine a circumstance in which damage to any property does not directly, naturally and predictably result in some emotional upset. Unless some other line is drawn, as we believe there must be as a policy matter, neither the quality of a defendant's conduct nor the predictability of distress as a result of property damage alone or together form a basis for an award of compensatory damages for emotional distress.

*Meyer v. 4-D Insulation Co.*, 60 Or. App. 70, 74 (1982). Though this case arises in a slightly different context, the *Meyer* court's reasoning applies here as well. Moreover, here, unlike in *Meyer*, there is no alleged property damage, only economic damage. Therefore, here, there are even less

grounds to render the claim outside of the economic loss doctrine sphere.

Because the doctrine applies, to recover on their negligent representation claim, the Clauses must show the existence of a special relationship in which Columbia had some obligation to pursue the Clauses' economic interests, independent of the Loan Agreement. They fail to do so.

Under the requisite *Hettle* factors, first, it does not appear the Clauses relinquished control over their financial matters. To the contrary, second, the Clauses at all relevant times maintained the authority to exercise their independent judgment in negotiating and entering into the Loan Agreement. Though they apparently gave up control of the builder vetting process, that decision was made of their own accord, and they retained the authority either to conduct their own evaluation of SHB or pull out of the loan if they disagreed with the recommendation to choose SHB. Third, the allegations do not support that Columbia assumed any particular duty to further the Clauses' interests beyond that of a typical financial lender. Rather, like the defendant-lender in *Onita*, *Uptown Heights*, and *Thormahlen*, Columbia acted as an adversarial party negotiating at arm's length to further the bank's own economic interests. Fourth, this relationship imposes only the typical duty to act reasonably, nothing more.

In their Response to the Motion, the Clauses provide extensive information related to their past relationship with Columbia, (*see* Defs.' Resp. Br. at 3–7, 32–34, 39–40), but none supports the type of special relationship required to allow economic recovery for a negligent representation. The Clauses note their "long and productive" general "banking history," their personal friendship with Columbia's predecessor organization's commercial loan officer, and that Columbia and its predecessors have "participated in [] many of [the Clauses'] community efforts" and "loaned several millions of dollars" to the Clauses "over the years for a variety of projects including . . . construction

financing, lines of credit, business loans, short term financing, long term property financing, oversight, review and monitoring." (Defs.' Resp. Br. at 3–4.) They also argue that because Columbia was in charge of the "change work orders," that is, because Columbia had control over whether to allow "change[s] in the original set of [development] plans," it could "modify liabilities" or approve cost increases. (Defs.' Resp. Br. at 13.)

These allegations do not appear in the Clauses' complaint, however, and therefore cannot be relied upon to support a negligent representation claim in their complaint. But even if they were included in the complaint, these facts suggest only that the longstanding relationship between the Clauses and Columbia was one of a typical borrower and lender. Regardless of whether the longevity of the relationship or the Clauses' personal ties to bank employees led the Clauses to believe their connection to Columbia was in some way different than their connection to other lenders, under *Uptown Heights*, even that "special relationship of trust and confidence" did not impose a heightened duty on Columbia.

As to the Clauses' change work order argument, even assuming the Clauses are correct that such an arrangement is uncommon between lender and borrower, and thus indicative of a special relationship, the Clauses do not provide any information as to why or how Columbia came to have such control over the work orders. Moreover, under *Thomahlen*, in which the lender in a construction loan agreement undertook financial disbursements and work inspections, even a lender's substantive participation in construction or development activities is not enough to impose a heightened duty of care.

The Clauses cite *Reynolds v. Schrock*, 197 Or. App. 564 (2005), *rev'd*, 341 Or. 338 (2006), to argue Columbia was "participating and directing, becoming part of the process." (Defs.' Resp.

Br. at 14.)  However, reliance on *Reynolds* is misplaced.  First, the case is factually inapposite.

*Reynolds* centered on whether the attorney had an independent fiduciary duty to his client's business

partner.  *Reynolds,* 197 Or. App. at 568.  Here, Columbia's attorney's duty is not at issue.  Second,

the Oregon Supreme Court later reversed the case on related grounds.  *See Reynolds v. Schrock*, 341

Or. 338, 353–54 (2006).

Finally, the Clauses argue that even if their connection to Columbia does not constitute a

special relationship under Oregon law, it may under federal law.  However, under the Supreme

Court's *Erie* doctrine, when hearing state law claims, "federal courts sitting in diversity apply state

substantive law . . . ."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  Therefore,

it is Oregon state substantive law that governs the Clauses' claims.

Still, as *Uptown Heights* and *Thormahlen* suggest, if the Clauses can allege facts sufficient

to support that their past course of dealings with Columbia or its predecessors somehow established

that the bank voluntarily assumed activities or duties above those traditionally associated with the

normal role of a financial lender, they may be able to remedy the aforementioned deficiencies.

However, even granting the Clauses' response the requisite liberal construction and benefit of any

doubt, they currently fail to state that Columbia went beyond its ordinary function as a financial

lender.  Accordingly, their negligent representation claim fails under the economic loss doctrine and

is dismissed.

III.     Third Claim for Relief – Breach of Contract.

Finally, the Clauses allege Columbia breached the parties' Loan Agreement by wrongly

exercising the foreclosure rights provided therein.  They interpret the Agreement as "provid[ing]

relief from breach due to liens or encumbrances on the Subdivision lots if a genuine dispute existed

regarding the validity of the lien or encumbrance." (Compl ¶ 38.)  The Clauses accept that they "were in breach due to a combination of [the] erroneous [writ] and SHB['s] failure to pay their subcontractors," but contend that these encumbrances constituted "genuine dispute[s]" sufficient to preclude Columbia from foreclosing under the Agreement.  (*Id*.)

Columbia argues the Clauses fail to state such a claim for two reasons.  First, it agrees that the Loan Agreement provides the Clauses with relief from foreclosure stemming from genuine, good faith disputes, but asserts that the Clauses failed to substantially perform the requirements to trigger that provision.  Second, Columbia contends the loan's maturation on October 8, 2014, independently justified its subsequent foreclosure.

To state a claim for breach of contract under Oregon law, a plaintiff must establish not only the opposing party's nonperformance of a duty under the contract, but also substantial "performance of the contract on his [or her] own part . . . ."  *Huszar v. Certified Realty Co.*, 266 Or. 614, 620 (1973).

Under the Loan Agreement, any "creditor or forfeiture proceeding[]" against the loan's collateral constitutes a default event.  (Agreement at 6.)  Specifically, "[c]ommencement of foreclosure or forfeiture proceedings . . . against any collateral securing the loan" or "garnishment of any of Borrower's accounts, including deposit accounts, with Lender" triggers default.  (*Id*.)  In the event of default, the Agreement affords Columbia the right, among other remedies, to "[a]ccelerate maturity on the . . . indebtedness and demand payment of all sums due. . . ; [b]ring an action on the . . . indebtedness; [or f]oreclose Lender's . . . Deed of Trust . . . on the Property in any manner available under law . . . ."  (*Id*.)  However, default does

not apply if there is a good faith dispute by Borrower as to the validity or

reasonableness of the claim which is the basis of the . . . proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve bond for the dispute.

(*Id.*)

Based on the information currently before the court, it is unclear when exactly Columbia initiated foreclosure. According to the Complaint, Columbia foreclosed on the loan through the state court action initiated by the unpaid subcontractors. The subcontractors filed suit in mid-September 2014, but it is unclear when Columbia asserted its foreclosure claims against the Clauses. It is therefore possible that Columbia foreclosed before the October 8, 2014 maturation date. That the maturation date has since passed cannot retroactively ratify premature foreclosure. Moreover, the Clauses also allege that Columbia "froze[]" the loan and refused to make disbursements sometime after the writ was filed on August 22, 2014, more than a month before the loan matured. If Columbia did so before the maturation date, that too would constitute material breach on its part. Thus, the October 8, 2014 maturation of the loan alone does not support dismissing the breach of contract claim.

Columbia's other proffered basis for dismissal fares better. The Clauses fail to state a legally cognizable claim because under the terms of the Agreement, Columbia was within its express, contractual right to foreclose from the time the first subcontractor filed its lien in July 2014. Columbia's foreclosure right was then independently triggered again in August 2014 when the writ of garnishment was filed, albeit erroneously. Both of those events constituted default under the contract and, therefore, justified Columbia's initiation of foreclosure proceedings.

Even if, as the Clauses argue, the erroneous writ or the subcontractor liens constituted good

faith disputes, the Clauses were required under the Agreement both to give Columbia written notice of the disputes and to deposit funds or bonds with Columbia, deemed adequate in the bank's sole discretion, to cover the disputes. That Columbia actually knew about the disputes did not excuse the Agreement's written notice requirement. Nothing in the complaint demonstrates the Clauses either provided written notice of the disputes or deposited reserve funds with Columbia. Absent allegations that the Clauses did so, Columbia was under no duty to forbear foreclosure.

Unless the Clauses can demonstrate they provided the notice and deposited with Columbia sufficient funds as required by the Agreement or can provide a legally sufficient justification for their breach, both the subcontractor liens and the writ, regardless of whether either qualified as a good faith dispute under the meaning of the contract, constituted default events that justified Columbia's accelerated foreclosure. Accordingly, the breach of contract claim as currently pleaded is dismissed.

IV.    Leave to Amend.

If the court dismisses a complaint, it must then decide whether to grant leave to amend. Leave to amend should be granted with "extreme liberality." *Eminence Capital, LLC. v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir.2003). Ninth Circuit repeatedly has held that dismissal without leave to amend is improper, even if no request to amend the pleading was made, unless it is clear that the defective pleading cannot possibly be cured by the allegation of additional facts. *Snell v. Cleveland, Inc.*, 316 F.3d 822, 828 n.6 (9th Cir. 2002) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 692 (9th Cir. 2001)); *Lopez v. Smith*, 203 F.3d 1122, 1130–31 (9th Cir. 2000).

Here, the court finds leave to amend is appropriate on all of the Clauses' claims because it is possible the Clauses may be able to cure the aforementioned deficiencies in their pleading by alleging certain additional facts. Those facts must add detail regarding what, when, where, and how

Columbia represented SHB was creditworthy and adequately capitalized, under the requirements of Rule 9. The Clauses also must plead factual allegations to support that Columbia knew that representation was false and that the Clauses' reliance on that representation was reasonable. With respect to their negligence claim, the Clauses must plead facts showing that they shared a special relationship with Columbia, independent of the parties' relationship as borrower and lender and of their past course of dealings. Finally, as to the breach of contract claim, because it appears the Clauses were in default of the Agreement, the Clauses either must allege they complied with the contract's notice and deposit provisions or they must provide some other basis for contractual recovery.

*Conclusion*

For the reasons stated above, Columbia's motion to strike, ECF No. 24, and motion to dismiss, ECF No. 14, are GRANTED. However, the dismissal is without prejudice and with leave to amend. Accordingly, the Clauses may file an amended complaint repleading their claims, to cure the deficiencies stated above, within 30 days of this Opinion and Order.

DATED this 17th day of April, 2018.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge