UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT J. CLAUS, and
SUSAN L. CLAUS

             Plaintiffs,

    v.

COLUMBIA STATE BANK,

             Defendant.

Case No. 3:16-cv-01509-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiffs Robert James Claus and Susan Claus (collectively, the "Clauses") seek money damages from their former lender, Defendant Columbia State Bank ("Columbia"), for allegedly misrepresenting the capitalization and creditworthiness of Signature Home Builders ("SHB") and for breaching parties' construction loan contract. Before the court are Columbia's Motion to

Dismiss and the Clauses' Motion to Accept the Amended Complaint. (Def. Mot. to Dismiss Pl. First Am. Compl., ECF No. 73 ("Def. Mot."); Mot. to Accept the Am. Compl., ECF No. 77.)[1]

*Factual Background*

Since the mid-1980s, the Clauses have engaged with Columbia and its predecessor organizations in "a continuous and extensive banking relationship" as "private banking customers." (Am. Compl., ECF No. 73 ("Am. Compl.") ¶ 4.) Due to concerns over costs related to their declining health, the Clauses undertook a development project as an investment that could pay for medical and other expenses. (*Id.* ¶¶ 7, 8.)

In late 2011, the Clauses sought a loan from West Coast Bank ("West"), a predecessor to Columbia, to develop eight lots in their "McFall subdivision." (*Id.* ¶ 8.) As part of the loan process, West required the Clauses to sell their Oregon ranch property before issuing the loan, and the Clauses were subject to "an exhaustive review of [their] real estate portfolio and financial situation." (*Id.* ¶¶ 11, 12.) As alleged by the Clauses, West was aware of the Clauses' ongoing health issues and "voluntarily committed to administering the financial management of the building process." (*Id.*, ¶ 9.) Specifically, West promised it "would monitor the progress of the construction and see that the contractor, subcontractors, and suppliers" were paid, and for doing so, the "Clauses paid $18,000 to [West's successor,] Columbia[,] for administrating and processing the line of credit over the life of the project, with such administration to include builder oversight, disbursement of funds, and contract approval." (Am. Compl. ¶¶ 9, 24.) Moreover, West went so far as to create the initial plan for the McFall subdivision. (*Id.*, ¶ 10.) In April 2013, while the

---

[1] The parties have consented to jurisdiction by magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

Clauses were still securing the loan from West, Columbia purchased West and continued the Clauses' appraisal process. (*Id.* ¶¶ 13, 15.)

In October 2013, Columbia issued the loan, in the amount of $900,000, secured by a deed of trust on the property. (Decl. of Stanley Cruse, ECF No. 15 ("Cruse Decl."), Ex. 3 at 1.) Among other restrictions, the Loan Agreement specified that only two lots could be built at a time. (*Id.* ¶ 23.) The Clauses allege Columbia orally promised to assume responsibility for "obtaining the invoices and proof of payment" to SHB and all subcontractors, and its disbursement system, AccuDraw, to oversee the project, disbursement of funds, and contract approval. (Am. Compl. ¶ 24.) But, the terms of the Construction Loan Agreement did not reflect Columbia's promised involvement. (Cruse Decl., Ex. 1.) Instead the Loan Agreement indicated that the Clauses were responsible for managing the project and submitting contractors, plans, builder contracts, and requests for the money disbursements. (*Id.* at 3.) The Loan Agreement, however, did provide that at its option Columbia could "directly pay the General Contractor . . . sums due . . . [and the Clauses] appoint [Columbia] as the attorney-in-fact to make such payments." (Cruse Decl., Ex 1 at 3.) Moreover, the Loan Agreement indicates it was fully integrated at the time of signing and amendments could be submitted only in writing with parties' consent. (*Id.* at 7.) The Loan Agreement required that Columbia would have "approved a list of all contractors employed," but no provision of the Loan Agreement provides a selection procedure for a general contractor. (*Id.* at 2.) Under the Loan Agreement, a creditor or forfeiture proceeding would constitute an event of default unless "there is a good faith dispute" as to the "validity or reasonableness of the claim which is the basis of the . . . proceeding." (Cruse Decl., Ex. 1 at 6.) Additionally, the Loan

Agreement contained a maturity acceleration provision in the event the Clauses defaulted. (*Id.* at 6.)[2]

As the Clauses allege, Columbia made representations about the Clauses' prior relationship with Columbia's predecessor and about SHB. With respect to the relationship between the Clauses and Columbia, officials at Columbia, who were also former employees at West, assured the Clauses the same services previously provided by West still could be expected through Columbia. (Am. Compl. ¶ 14.) Specifically, Columbia officials told the Clauses it was the "same community bank with a different name," and "nothing had changed with respect to the relationship between the bank and the Clauses." (*Id.* ¶¶ 14, 15.) However, the Clauses do not allege any assurances were made relating to any specific prior promise. Notably, a predecessor to Columbia, Commercial Bank, performed services for the Clauses that were outside the scope of a normal banking relationship between the 1980s through 1995, such as "property inspections, loan budgeting, project management and investment advice." (Am. Compl. ¶ 5.)

Columbia "mandated" SHB serve as the general contractor on the project, though it was not the Clauses' preferred general contractor, because SHB was a "turnkey builder."[3] (*Id.* ¶ 16.) Kelly White ("White"), a senior loan officer at Columbia, and Juan Mendoza ("Mendoza"), another loan officer at Columbia, allegedly made various misrepresentations about SHB's credit and capitalization. (*Id.* ¶ 17.)

/ / / / / /

---

[2] The parties dispute whether the note was due in October 2024 or 2014. Defendant argues that the 2024 reference was an error. (Cruse Decl., Ex. 2 at 1; Cruse Decl., Ex. 3 at 1.)

[3] A builder that constructs projects for immediate use without securing a buyer in advance, also known as a speculative, or "spec," builder. *Turnkey*, AMERICAN HERITAGE DICTIONARY 1872 (5th ed. 2010).

Specifically, White and Mendoza made five representations regarding SHB between June and October 2013. (*Id.* ¶ 17.) First, White assured the Clauses "Columbia's commercial loan department had conducted an extensive review of SHB and its three members, as well as its projects, business history, and creditworthiness." (*Id.* ¶ 17.) Second, White assured the Clauses there were no issues regarding SHB that "would constitute 'red flags.'" (*Id.* ¶ 17.) Third, both White and Mendoza represented that Columbia had "thoroughly checked out SHB with the Oregon Secretary of State's office," and confirmed SHB "was appropriately licensed and bonded with the State of Oregon" and with the Oregon Construction Contractors Board ("CCB"). (*Id.* ¶ 17.) Fourth, White asserted "SHB and its three principals had good credit" and had no outstanding judgments or liens against SHB. (*Id.* ¶ 17.) Lastly, both White and Mendoza represented that "SHB was a full-service builder, meaning that it was licensed and had the employees necessary to complete all the work on a home without having to hire subcontractors." (*Id.* ¶ 17.) SHB, however, was not a full-service builder, but rather a "broker-builder," which meant the principals borrowed money from the company "to hire out all the physical work to subcontractors." (*Id.* ¶ 19.)

Because of the representations made by Mendoza and White, the Clauses relied on the evaluation of SHB's creditworthiness and capitalization. (Am. Compl. ¶ 18.) However, when such representations were made, SHB's members was either "in or had recently emerged from Chapter 7 bankruptcy proceedings," and the SHB member assigned to supervise the development project was not listed as a member on the contractor's license with CCB. (*Id.* ¶ 19.) Furthermore, White and Mendoza made the representations notwithstanding various negative financial documents from SHB, such as a December 31, 2012 balance sheet that reported a deficit equity of $62,041 and that did not reconcile with an S corporation tax form filed with IRS. (*Id.* ¶ 20.) The Clauses allege they would not have chosen to proceed with SHB had they known of its precarious

financial position, but Columbia claimed its evaluation of SHB was a trade secret or confidential when the Clauses requested it for review. (*Id.* ¶¶ 18, 21.)

Although the sale of the Clauses' ranch had not yet closed and the loan was not yet ready, White nevertheless advised the Clauses to proceed with development of Lot 6. (*Id.* ¶ 25.) As a result of various delays on part of SHB and SHB's lack of payment for necessary building permits, the Clauses paid more in permit fees and interest payments than if SHB had met its contractual obligations. (*Id.* ¶¶ 25, 26.)

Thereafter, the Clauses allege Columbia failed to diligently administer the project, as promised, in the following ways: (1) Columbia made disbursements without first ensuring SHB provided adequate supporting documentation, (2) failed to get lien releases from SHB, (3) allowed SHB to list and sell Lot 6 at less than fair market value and without an agreement made by the Clauses, and (4) did not intervene when SHB commenced the development process on Lot 3, despite the Loan Agreement requiring no more than two houses could be developed at a time. (*Id.* ¶¶ 27, 28, 29.)

In June 2014, SHB left Lots 3, 4, and 5 unfinished in the McFall subdivision. (Am. Compl. ¶ 30.) Though White attempted to find a new general contractor, Columbia could not secure a replacement because it refused to supply a list of subcontractors and suppliers used by SHB to the replacing contractor. (*Id.* ¶¶ 30, 31.)

In July 2014, Columbia notified the Clauses that Parr Lumber, a supplier for SHB, issued a notice of lien against Lots 1, 2, 3, 4, 5, 8, and 9 for supplies delivered and not paid for. (*Id.* ¶ 32.) Over the following months, other suppliers and subcontractors filed liens against the properties. (*Id.* ¶ 32.) Because of oversights and errors, a default judgment and a writ of garnishment entered against the Clauses on August 22, 2014, in the Circuit Court of the State of

Oregon for the County of Gilliam. (*Id.* ¶¶ 33, 34.) Columbia ultimately filed its own liens on Lots 4 and 5, but Columbia was still named as a defendant in the foreclosure proceedings brought by other subcontractors in September of 2014. (*Id.* ¶ 36.) Although the Clauses allege they timely informed Columbia of the proceedings, the Clauses do not allege that Columbia received written notice of the proceedings. (*Id.*)

In October 2014, the CCB provided the Clauses with copies of paid and unpaid invoices from SHB's suppliers and subcontractors, which showed "Columbia incorrectly allocated funds" when disbursing payments to SHB, and that "SHB had kept more than $85,000 by failing to pay its suppliers and subcontractors." (Am. Compl. ¶ 37.) That same month, White informed the Clauses there was a "strong possibility" the liens and default judgments could be resolved if the remaining liens could be paid or dismissed. (Am. Compl. ¶ 38.) However, the Clauses' loan file was transferred to a different Columbia official in November 2014, and Columbia rejected the Clauses' offer to pay $150,000 to satisfy the valid liens. (*Id.* ¶ 39.)

Though the liens and forfeiture proceedings were allegedly disputed in good faith, Columbia froze the Clauses' line of credit and did not request the Clauses provide a surety bond. (*Id.*, ¶ 39; Cruse Decl., Ex. 3 at 2.) Consequently, the Clauses used the remaining funds, combined with a private loan, to complete the unfinished homes on Lots 4 and 5. (Am. Compl. ¶ 41.)

In March 2015, the Clauses, Columbia, and various lienholders agreed to use the proceeds from the sale of Lot Four to pay off the remaining liens. (Am. Compl., ¶ 43.) The proceeds of selling Lot 4 allowed the Clauses to pay off the participating lienholders, and they were able to post a "bond in the amount of $203,558 to remove SHB's liens on Lots 4 and 5." (*Id.* ¶ 43.) The Clauses allege they suffered significant economic harm as a result of Columbia's pursuit of the foreclosure proceedings. (*Id.* ¶ 48.)

The Clauses filed suit against Columbia in the Circuit Court of the State of Oregon for the County of Washington on June 22, 2016. (Notice of Removal, ECF No. 1.) On July 26, 2016, Columbia removed the case to federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332. (*Id.*) On April 17, 2018, the court granted Columbia's first motion to dismiss with leave to amend the claim. (Op. and Order, ECF No. 65 ("Op. and Order") at 33.) The Clauses filed their amended complaint on September 17, 2018, which included three new claims: negligent misrepresentation, breach of the obligation of good faith and fair dealing, and promissory estoppel, in addition to the original claims of breach of contract and fraud. (Am. Compl. at 12-14, 17.)[4] Subsequently, the Clauses moved the court to accept the amended complaint. (Mot. to Accept First Am. Compl., ECF No. 77.)

*Preliminary Procedural Matters*

As part of Columbia's Motion to Dismiss, Columbia moves the court to consider materials outside of the pleadings in support of their motion. In general, material outside the pleadings may not be considered in ruling on a motion to dismiss unless the motion is treated as one for summary judgment, and the parties are "given reasonable opportunity to present all materials made pertinent to such motion by Rule 56." *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995). There are two exceptions to this rule. First, a court may consider "material which is properly submitted to the court as part of the complaint," and second, under Federal Rule of Evidence ("FRE") 201, the court may take judicial notice of "matters of public record." *Lee v. Cty of Los Angeles*, 240 F.3d 754, 774 (9th Cir. 2001, *overruled on other grounds by Galbraith v. Cty of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002). A document is not considered "outside" the complaint if the complaint specifically refers to the document, its authenticity is not questioned,

---

[4] Discussed *infra*, negligent misrepresentation has a statute of limitations of two years.

and the plaintiff's complaint necessarily relies on it. *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam).

The materials Columbia has submitted in support of its motion are properly before the court. The Loan Agreement and the accompanying documents are not outside of the pleadings because the Clauses' complaint specifically refers to and necessarily relies on them, and neither party challenges their authenticity. Accordingly, the court finds that the Loan Agreement and accompanying documents are not outside the complaint, Columbia's motion should be treated as a motion to dismiss rather than for summary judgment.

*Legal Standard*

I.    Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure ("Rule") 8 requires that complaints in federal court consist of "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" FED. R. CIV. P. 8(a)(2). Pleadings need not contain detailed factual allegations, but "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, a claim "may proceed even if it strikes a savvy judge that actual proof of [necessary] facts is improbable," and the plaintiff is unlikely to succeed on the merits. *Id.* at 556.

Although a plaintiff need not allege detailed facts, a motion to dismiss under Rule 12(b)(6) will be granted if the pleading fails to provide "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. 554, 570 (2007). A claim rises above the speculative level "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The court is required to "assume the veracity" of all well-pleaded factual allegations and draw all "reasonable inferences in favor of the nonmoving party." *Holden v. Hagopian*, 978 F.2d

1115, 1118 (9th Cir. 1992). Thus, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citation omitted).

Moreover, *pro se* pleadings must be "liberally construed." *Allen v. Gold Country Casino*, 464 F.3d 1044, 1048 (9th Cir. 2006). Before dismissing a *pro se* litigant's complaint, the court must give the *pro se* litigant leave to amend his complaint unless it is "absolutely clear that the deficiencies of the complaint cannot be cured by amendment." *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007).

Here, the Clauses' original complaint was drafted by an attorney who has since withdrawn from the case. Thereafter, they filed their motion to accept first amended complaint *pro se*. However, the "amended complaint was prepared mostly by attorneys that Plaintiffs had hired for the limited purpose." (Mem. in Supp. of Pl. Mot. to Accept First Am. Compl., ECF No. 78 ("Mem. in Supp.") at 1.) Nonetheless, the court will construe the Clauses' motions liberally.

II.     Leave to Amend – Fed. R. Civ. P. 15(a)(2)

FRCP 15(a) provides that leave to amend "shall be freely given when justice so requires." *Segal v. Rogue Pictures*, 544 F. App'x 769, 770 (9th Cir. 2013) (citation omitted); FED. R. CIV. P. 15. The court may, however, deny leave to amend upon consideration of several factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178 (1962)).

*Discussion*

The court has taken Columbia's Motion to Dismiss and the Clauses' Motion to Accept First Amended Complaint under advisement together, and thus will discuss each in turn. With Columbia's Motion to Dismiss, the court will discuss the amended claims of fraud and breach of contract. Next, the court will discuss the newly asserted claims of negligent misrepresentation, breach of the obligation of good faith and fair dealing, and promissory estoppel.

I.    Fraud

To establish a claim for fraud under Oregon law, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew that the representation was false; (3) the defendant intended the plaintiff to rely on the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) the plaintiff was damaged as a result of that reliance. *Horton v. Nelson*, 252 Or. App. 611, 616 (2012) (citing *Strawn v. Farmers Ins. Co.*, 350 Or. 336, 352, *adh'd to on recons.*, 350 Or. 521, 256 (2011), *cert. den.*, 565 U.S. 1177 (2012)); *see also Knepper v. Brown,* 345 Or. 320, 329 (2008) (noting that more recent Oregon cases use the abbreviated five-element list as opposed to the older nine-element list, and that historical references to proximate cause are subsumed in the last element of the abbreviated list). A plaintiff must establish each element of fraud by clear and convincing evidence. *Riley Hill Gen. Contractor, Inc. v. Tandy Corp.*, 303 Or. 390, 392 (1987) (en banc).

The following elements are in dispute: (1) that the Clauses' reliance was justified; (2) that Columbia knew its representation – that "SHB was a reputable builder that had strong credit and adequate capitalization" – was false; and (3) that Columbia intended to induce the Clauses with the alleged misrepresentation.

/ / / / / /

/ / / / / /

A.     *Justifiable Reliance*

The Clauses argue their reliance on Columbia's representation regarding SHB's credit and capitalization was justified because of their "longstanding relationship" with Columbia and its predecessors, because Columbia went beyond the typical lender-borrower relationship by overseeing certain financial aspects of the project, and because Columbia's evaluation of their own credit was extensive. (Pl. Resp. at 15.) The Clauses also allege reliance was justified, in part, because Columbia was aware of the Clauses' health status and promised to financially administer the project. (*Id.* at 14.) In response, Columbia argues the fiduciary duties the Clauses reference have long since ceased, and the conclusory statements made by the Clauses do not support any justifiable reliance on behalf of the Clauses. (Def. Reply 14.)

"Whether reliance is justified requires consideration of the totality of the parties' circumstances and conduct, which includes whether the party claiming reliance took reasonable precautions to safeguard his or her own interests." *Masood v. Safeco Ins. Co. of Oregon*, 275 Or. App. 315, 332, 365 P.3d 540 (2015) (citation omitted) (internal quotations omitted). Finding justifiable reliance therefore "hinges on the extent to which the plaintiff had a duty to investigate the truth of the statement." *Murphy v. Allstate Ins. Co.*, 251 Or. App. 316, 324 (2012). Oregon law has focused on two criteria to make this determination: first, the ability of a party to obtain information, *i.e.* the "difficulty that a plaintiff would encounter in conducting an independent investigation of the truthfulness of the statement;" and second, the relative sophistication of the parties – that is, "whether the parties are equally capable of evaluating certain facts about the statements." *Id.* at 325. Furthermore, parties can be equally sophisticated when the parties have prior experience with the particular subject matter, even if the respective experiences vary. *See id.* at 317-19, 326 (finding that a jury could conclude that the parties were equally sophisticated when

plaintiff, a long-time construction worker, relied on statements by defendant-claims adjuster that permits were not needed to complete restoration work).

Here, though Columbia refused to disclose documentation related its evaluation of SHB, the Clauses do not allege they would have encountered difficulty in obtaining the public information regarding SHB or that they tried to obtain such information at all. Moreover, the longstanding history of the parties, and their multiple successful dealings in the past, suggest the relative sophistication of the parties is near equal with respect to development projects and selecting contractors. In other words, both parties could equally evaluate certain facts and make informed decisions based on those facts. For example, the Clauses assert that had they known about the financial status of the general contractor, they would have opted to partner with their preferred dealer. This assertion suggests the Clauses are equally capable of evaluating certain facts about Columbia's statements regarding SHB. Conversely, the terms of the Loan Agreement – that Columbia would need to approve the general contractor – suggests Columbia is familiar with development projects enough to evaluate a general contractor.

However, the poor health of one party, which could adversely affect both the difficulty of conducting an independent investigation of a statement's veracity and the evaluation of material facts, must be taken into account. *See Soursby v. Hawkins*, 307 Or. 79, 87 (1988) (stating that a real estate purchaser may rely on representations if "discovering the truth would be unreasonably difficult"). The facts alleged in the Amended Complaint do not indicate the Clauses' health or mental state was affected such that their duty to investigate was somehow diminished. On the contrary, the fact the Clauses were able to contract with another contractor and finish the development without Columbia's assessment of a general contractor demonstrates the Clauses were able to act on their duty to protect their own interests without Columbia's evaluation. This

undercuts their argument that their reliance on Columbia's representations was justified. Moreover, if true, the promise to provide financial oversight of the project did not alter the Clauses' duty to investigate, as the promise of financial oversight does not explain how the reliance on the selection of SHB was justified. Additionally, merely concluding reliance was justified because a longstanding relationship exists does not address whether a party's duty to investigate was satisfied.

Finally, the extensiveness of their own credit check has no bearing on the reasonableness of their reliance on Columbia's representations. That the Clauses' credit check was extensive in no way relieves them of their own duty to investigate Columbia's assertions regarding the credit of a third party whom they ultimately hired. Additionally, and as discussed *infra*, assuming responsibility of the financial oversight of the project does not change the nature of the typical lender-borrower or lender-developer relationship. *See Bennett v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 161 (2001) (reasoning that a heightened duty is imposed when the relationship, "by its nature, allows one party to exercise judgment on the other party's behalf"). Accordingly, because factual support of the Clauses' duty to investigate is lacking, the allegations with respect to the Clauses' justified reliance are not plausible.

B.    *Knowledge of Falsity*

Defendant argues that the Clauses have failed to allege facts showing Columbia knew its representation was false, and though the Clauses allege facts that support the falsity of Columbia's representation, the Clauses fail to allege facts showing Columbia knew of this information. (Def. Mot. at 20.) The Clauses argue Columbia's representations – that Columbia conducted an "extensive review" of SHB and that Columbia went through SHB's information with a "fine-tooth comb" similar to the review of the Clauses' finances – support Columbia's knowledge of the falsity of their representation that SHB had strong credit and was adequately capitalized. (Pl. Resp. at

14-15; Am. Compl. ¶¶ 17, 18.) Furthermore, the Clauses argue that "[d]eficit equity, indebtedness, negative gross profit, and negative expenses are not consistent with strong credit and adequate capitalization," and that it is reasonable to infer that Columbia knew that SHB was "a mere shell and not a full-service contractor." (Pl. Resp. at 16.)

Specifically, the Amended Complaint alleges that Columbia would have known the falsity of their assertions based on a 2012 balance sheet reporting notes receivable and loans receivable by the owners in the amount of $120,478 and $141,533, respectively, and a deficit equity of $62,041; a negative gross profit and negative expenses report; and that SHB's members were "in or had recently emerged from Chapter [seven] bankruptcy proceedings." (Am. Compl. ¶¶ 19, 20.) Further, the Clauses allege Columbia's agents represented to the Clauses that SHB was a "full-service builder," meaning that it was "licensed and had the employees necessary to complete all the work on a home without having to hire subcontractors;" that "Columbia's commercial loan department had conducted an extensive review of SHB and its three members, as well as projects, business history, and creditworthiness;" and that SHB had strong credit and adequate capitalization. (Am. Compl. ¶¶ 17, 18, 19.)

Although the substantive elements of a state law fraud claim are determined by state law, those elements still must be pleaded "with particularity." Fed. R. Civ. P. 9(b); *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). Knowledge of falsity can be proven by alleging facts that establish the speaker's knowledge of falsity of the representation or the ignorance of its truth. *Burgdorf v. Weston*, 259 Or. App. 755, 771 (2013).

/ / / / / /

/ / / / / /

/ / / / / /

A member filing for bankruptcy does not mean the LLC is equally affected. *See* ORS 63.265(1)-(2)(a)[5]; *see also Smith v. Cent. Point Pawn, LLC,* 296 Or. App. 341, 347, 438 P.3d 436, 440 (2019) (holding that the summary judgment record contained sufficient evidence to create a triable issue whether the debt incurred by an LLC member also bound the LLC to the same debt); *see also In re Woodfield,* 602 B.R. 747, 753 (Bankr. D. Or. 2019) (stating that "Oregon law creates a process of dissociation when a LLC member files a bankruptcy petition . . . [and] if a member of a multi-member LLC files a bankruptcy petition, that member ceases to be an LLC member, but retains the right to receive and retain . . . the distributions . . . and allocations of profits and losses to which the [member] would be entitled") (citation omitted) (internal quotations omitted). Further, a member filing for bankruptcy does not mean that the LLC has dissolved. ORS 63.249(2).[6] But, an LLC can be dissolved when the LLC has no members. ORS 63.621(4). Additionally, the assignment of a membership interest can be in whole or in part, and the assignor of the interest "ceases to be a member with respect to the interest assigned." ORS 63.249 (1), (2), (5).

The Clauses have not alleged facts to support that SHB, rather than one of its members, was in or recently emerged from bankruptcy proceedings, which could plausibly and negatively affect SHB's credit. At most, the fact that SHB's members filed bankruptcy would inform

---

[5] ORS 63.265(1) provides "[a] member shall cease to be a member in a limited liability company upon the member's death, incompetency, bankruptcy, dissolution, withdrawal, expulsion or assignment of the member's entire membership interest." ORS 63.265(2)(a) provides that "following the cessation of the member's interest, the holder of the former member's interest shall be considered an assignee of such interest and shall have all the rights, duties and obligations of an assignee under this chapter."

[6] ORS 63.249(2) provides that "[a]n assignment of a membership interest does not itself dissolve the limited liability company.

Columbia only that there was an assignee to part of an interest of the bankrupt member, not that the LLC's financial condition was affected. Moreover, there is no factual support to plausibly infer that the bankruptcy proceedings of the three members had a negative effect on SHB's credit or that the proceedings dissolved the LLC. Though possible that all three members were in bankruptcy proceedings at the same time, effectively leaving the LLC without members and causing its dissolution, the facts alleged do not support the plausibility that the LLC was dissolved at the time Columbia made the representations of SHB's creditworthiness and capitalization. Absent such factual allegations, SHB's members filing for bankruptcy does not support that Columbia knew or was ignorant of any bankruptcy proceedings affecting SHB. It is equally possible that SHB's creditworthiness was still in good standing despite the members' bankruptcy proceedings, or that the LLC had at least one member when Columbia made its representations about SHB's financial condition. Consequently, the Clauses have failed to allege facts supporting the falsity of Columbia's representation of SHB's creditworthiness at the time of the representation or Columbia's knowledge of such falsity.

Additionally, taking the allegation that Columbia reviewed 2012 financial forms and that SHB was not a "full-service builder" as true, there is not enough factual support that Columbia knew SHB was not adequately capitalized. The capital contributions by the members of an LLC can be either cash, property, services rendered or a promissory note or other obligation to contribute cash, property, or render services. ORS 63.175. When analyzing whether a corporation was adequately capitalized, Oregon courts have emphasized that "a corporation must have sufficient capital to cover its reasonably anticipated liabilities, measured by the nature and magnitude of its undertaking, the risks attendant to the particular enterprise and normal operating costs associated with its business." *Klokke Corp. v. Classic Exposition, Inc.*, 139 Or. App. 399,

405, 912 P.2d 929, 932-33 (1996).[7] Also, "[b]ecause loans to the corporation do not increase the worth of the corporation or the assets available to conduct its business, they are not part of its capitalization." *Id.* Lastly, "[t]he sufficiency of capital is determined at the time a corporation is formed and in the beginning of its operation." *Stirling-Wanner v. Pocket Novels, Inc.*, 129 Or. App. 337, 341 (1994).

Regarding the 2012 financial statements, the Clauses do not allege that Columbia reviewed only the 2012 financial statements, but they allege that in light of the 2012 financial statements, Columbia knew that SHB's credit and capitalization was not in good standing. A single year's balance sheet would not be able to show what contributions an LLC member made at the formation of the LLC, and the reference to loans receivable does not "increase the worth" of SHB or affect the assets available to conduct SHB's business. Thus, the member contributions to the LLC are not evident solely from the balance sheet, and the loans are not factored into whether SHB was adequately capitalized.

Though the deficit equity, $62,041, could be evidence of undercapitalization, ORS 63.175 provides that a member of an LLC could contribute in the form of services rendered or a future obligation to contribute cash, property, or perform services. Though it is possible that the deficit equity supports SHB's undercapitalization, it is equally possible that SHB's members had outstanding obligations to contribute cash, property, or performance of services, which likely would have been factored into SHB's credit check at the time of Columbia's representations. Thus, there is not enough factual to support the falsity of the representation at the time Columbia made its representations about SHB's capitalization.

---

[7] The parties have not provided authorities, nor has the court found any Oregon case law, suggesting the circumstances under which an LLC is considered to be undercapitalized.

Furthermore, the fact that SHB was not a "full-service builder" does not support a reasonable inference that SHB was not adequately capitalized. Whether SHB hired subcontractors or had employees to complete a project does not address the capitalization of the LLC. Accordingly, the 2012 financial statements and SHB not being a "full-service builder" does not support a plausible inference that Colubmia's representation regarding SHB's creditworthiness or capitalization was false, that Columbia knew of the falsity if it was false, or that Columbia was ignorant of its truth.

C.     Intent to Induce

Columbia argues that because the Clauses have not alleged facts supporting Columbia's knowledge of the falsity of representation, the Clauses have failed to allege facts to support the requisite intent for fraud. (Def. Mot. at 20.) In response, the Clauses argue that Columbia acted with a reckless disregard of the truth or falsity of the representation, because Columbia would have discovered the issues with SHB's credit through the "fine-tooth comb" review Columbia conducted on SHB. (Pl. Resp. at 16.)

Under Oregon law, the necessary intent in a fraud claim "consists of a defendant misrepresenting a material fact for the purpose of misleading the other party or with the knowledge he is misleading the other party or in reckless disregard of the fact he is misleading the other party." *U. S. Nat. Bank of Oregon v. Fought*, 291 Or. 201, 225 (1981) (citation omitted) (internal quotations omitted) (emphasis omitted). When a defendant makes a misleading representation, they assume the obligation to make a "full and fair disclosure of the whole truth." *Gregory v. Novak*, 121 Or. App. 651, 655 (1993). Moreover, active concealment of the falsity of a representation can form the basis of a fraud claim and does not require a duty to disclose. *Caldwell v. Pop's Homes*, Inc., 54 Or. App. 104, 113, 634 P.2d 471, 477 (1981).

Because of the plaintiff's burden to present clear and convincing evidence of fraud, the courts "will not presume fraud when the transaction is equally susceptible to two explanations, one which is consistent with fraudulent intent and the other with good faith and fair dealing." *S. Seattle Auto Auction Inc. v. W. Cas. & Sur. Co.*, 41 Or. App. 707, 714 (1979) (citation omitted). In determining whether the circumstances compel an inference of fraudulent intent, courts consider the "totality" of defendant's conduct. *Id.*

Though the requisite intent is satisfied with conduct committed in reckless disregard of misleading a party, the Clauses have failed to allege facts showing Columbia's representation was, in fact, false or misleading. The Clauses' argument – that Columbia would have discovered the bankruptcy proceedings of the individual members if Columbia conducted a "fine-tooth comb" analysis of SHB – does not support an inference of fraudulent intent. Discussed *supra*, bankruptcy proceedings of members of SHB does not necessarily inform a reviewing party of the creditworthiness of SHB, because Oregon law provides that a member is dissociated upon bankruptcy. The Clauses have not alleged facts supporting that the members' bankruptcy affected SHB or that SHB was in dissolution or liquidation stages at the time of Columbia's representations. Thus, Columbia's representation of SHB's credit might still have been true and not misleading even if Columbia had reviewed financial conditions of the individual members. Columbia would not have been able to act in reckless disregard if the underlying representation was not, in fact, misleading.

Stating that the documents were confidential and partly trade secrets, Columbia refused to disclose documents relating to Columbia's evaluation of SHB, which could support fraudulent intent by active concealment. (Am. Compl. ¶ 18.) However, Columbia's refusal of disclosing documents, by itself, does not rise to the level of active concealment. In *Wieber v. FedEx Ground*

*Package Sys., Inc.*, plaintiffs, Wieber and Interpid Corporation, entered into a three-year-term independent contractor agreement with FedEx in 2002, wherein FedEx agreed to make payments to plaintiffs for picking up and delivering packages within the designated area. 231 Or. App. 469, 481 (2009). Though the agreement provided that a contractor could sell the rights to a designated area only to a "replacement contractor acceptable to FedEx," FedEx could terminate the contract without notice if plaintiffs breached or failed to perform its contractual obligations. *Id.* at 473. Between 2002 and when plaintiffs purchased a new service area in 2004, FedEx already documented multiple incidents where "plaintiffs [failed to] provide adequate service under the agreement. *Id.*

In January 2004, however, plaintiffs purchased rights to an additional service area, incurring costs which totaled $35,000. *Id.* In February 2004, FedEx received two additional customer complaints from plaintiffs' service area, which prompted Wieber to inquire into the security of his contract with FedEx. *Id.* at 473-74. In response, FedEx's agent, Kline, assured Wieber that his contract with FedEx was "not in jeopardy," but that "[Wieber was] at a fork in the road." *Id.* at 473-74. Further issues were documented during the first quarter of 2004, and by mid-March 2004, Kline was in discussions with other contractors to take over some of Wieber's service areas. *Id.* at 474. By the end of March, Wieber asked Khut, FedEx manager, how much notice FedEx would provide in advance of terminating a service contract, to which Khut responded approximately "30 to 45 days." *Id.* At the time of Khut's representation, however, FedEx did not inform contractors when their service contracts had been recommended for termination. *Id.* Following this conversation with Khut, Weiber sought to purchase another vehicle for deliveries. *Id.*

/ / / / / /

The court examined two representations by FedEx to plaintiff Wieber: (1) Kline's representation that Wieber's contract "was not in jeopardy," and (2) Khut's representation that plaintiffs would be afforded thirty to forty-five days to sell their proprietary interests prior to contract termination. *Id.* at 480-81. The court determined, with respect to Khut's assertion, that fraudulent intent could be inferred as Khut actively concealed the false representation by directing another FedEx employee not to disclose to Wieber the plans to terminate Wieber's contract without notice, and that the approval of Wieber's most recent vehicle purchase was done, in part, to conceal the plans to cancel the contract. *Id.* at 484-85.

Unlike *Wieber*, Columbia's alleged conduct does not support a plausible inference of active concealment. The conduct by defendant in *Wieber* supported fraudulent intent because Khut explicitly instructed concealment of a false representation. Here, however, the facts alleged do not indicate that any of Columbia's agents had such discussions or that instructions similar to those in *Wieber* were given to the Columbia agents that conveyed the representations to the Clauses. Moreover, the defendant's conduct in *Wieber* – approving Wieber's purchase of a vehicle done, in part, to keep up the appearance that the contract was not up for termination – was an active step taken to give Wieber the impression that Khut's statement was true. There are no factual allegations that Columbia took create a false impression that its representations regarding SHB's credit and capitalization were true. Accordingly, there is no factual support that Columbia actively concealed a false representation.

For the reasons stated above, the Clauses have failed to state a claim for fraud. If the Clauses are able to plead sufficient factual support that they satisfied their duty to investigate the representation or explain why they did not carry out their duty, then the Clauses may satisfy the justifiable reliance element. Unless the Clauses can demonstrate that the members' bankruptcies

affected SHB, that SHB's members were in bankruptcy proceedings at the same time (in effect dissolving SHB when Columbia made its representations) or that SHB's agents engaged in active concealment, the elements of falsity, knowledge of falsity, and requisite intent have not been satisfied. Accordingly, the Clauses' claim for fraud is dismissed.

## II.    Breach of Contract

Columbia argues the Clauses defaulted on the loan and it acted within its contractual rights because the Clauses failed to satisfy a provision to initiate a good faith dispute, timely remove the liens, or deposit reserve funds with Columbia. (Def. Mot. at 17-18.) In response, the Clauses argue the liens were disputed in good faith because: (1) "it can be inferred that Plaintiffs provided such notice in written form[;]" (2) Columbia was the "party who notified [the Clauses] of the garnishment;" (3) Columbia was a named party in the foreclosure proceedings; (4) and the requirement to deposit funds or a surety bond could not be satisfied because Columbia never determined an amount and rejected the Clauses' offer to pay off the liens. (Pl. Resp. at 12-13.) Alternatively, the Clauses argue that the rule of *de minimis non curat lex* applies in this case and provides a legal excuse for their failure to provide Columbia with written notice. (Pl. Resp. at 12.)

To state a claim for breach of contract under Oregon law, a plaintiff must establish not only the opposing party's nonperformance of a duty under the contract, but also substantial "performance of the contract on his [or her] own part . . ." *Huszar v. Certified Realty Co.*, 266 Or. 614, 620 (1973). Under the Loan Agreement, a creditor or forfeiture proceeding would constitute an event of default unless "there is a good faith dispute" as to the "validity or reasonableness of the claim which is the basis of the . . . proceeding." (Cruse Decl., Ex. 1 at 6.) The Loan Agreement also required the Clauses gave Columbia "written notice" of the proceeding and deposits, monies, or a surety bond, "in an amount determined by [Columbia], in its sole discretion . . . ." (*Id.*)

As was stated in this court's prior Opinion and Order, to state a claim for breach of contract, the Clauses must demonstrate they "provided notice and deposited with Columbia sufficient funds" as required by the agreement, or provide a legally sufficient justification for their breach and both the liens and writ. (Op. and Order, ECF No. 65 at 32.)

Though the Clauses argue compliance with a contractual requirement can be inferred here, whether written notice was transmitted to Columbia per the terms of the agreement is not left to a question of inference. The Loan Agreement required the Clauses to provide Columbia with written notice. Columbia's awareness of the liens, judgment, and foreclosure proceedings does not absolve the Clauses of their contractual requirement to provide written notice that such proceedings were imminent. Likewise, Columbia being a named party would still not absolve the Clauses of their contractual requirement to provide written notice to Columbia.

With respect to the surety bond or deposited monies, the Clauses cite *Thompson v. Parke*, 40 Or. App. 359, 364-65 (1979), for the proposition that Columbia's refusal of their $150,000 offer to settle the liens implies any further negotiations would have been "futile," thus, absolving them of any obligation to deposit monies or a bond. Their reliance on *Thompson* is misplaced.

The issue before the *Thompson* court centered on whether oral modification to an option contract was enforceable and thus, afforded plaintiffs the remedy of specific performance of defendant's agreement to sell a specific parcel of land. *Id.* at 363-64. In *Thompson*, the defendant-sellers, from California, entered into a purchase option agreement with plaintiff-buyers, from Oregon, to buy defendants' land in Oregon. *Id.* at 361. The parties ultimately agreed that the option could be exercised by "making a down payment and executing a note and mortgage." *Id.* Though the parties made written amendments to the contract when defendants arrived at plaintiffs' attorney's office, the parties made an oral amendment to the contract the next day. *Id.* at 362. The

amendment provided that in lieu of the current agreement (down payment and installment payments to exercise the option) the parties agreed instead to a cash sale as exercise of the option. *Id.* While plaintiffs were in the process of obtaining funds to purchase the property, defendants rescinded their offer and instructed their bank not to accept funds from plaintiffs. *Id.* at 363.

The *Thompson* court held that the oral modification to the written agreement was enforceable. *Id.* at 364. The court reasoned that plaintiffs' not tendering payment did not defeat their specific performance suit because although plaintiffs were willing and able to pay, defendants' instruction to their bank rendered any further future offers of payment by plaintiffs "futile." *Id.* at 364-65.

Here, however, there is no allegation of an oral modification to the Loan Agreement such that the Clauses were relieved of tendering a surety bond or depositing monies with Columbia.[8] More specifically, there is no factual support that future negotiations would have been "futile," as in *Thompson*. Unlike *Thompson*, Columbia has not engaged in conduct that suggests that future settlement negotiations would have been futile. The Clauses rely on Columbia's refusal of a single offer as evidence of future negotiations being "futile." This is inapposite to *Thompson,* where the defendants explicitly instructed their financial institution to deny any future offer by plaintiffs. No such instruction or conduct suggesting futility of future negotiations is alleged here. Accordingly, the Clauses were not relieved of the requirement to deposit monies or a surety bond.

With respect to a legal justification, the Clauses argue the rule of *de minimis non curat lex* is applicable and excuses them from the requirement of providing written notice to Columbia. The court disagrees. In the cited authority, the Oregon Supreme Court examined rules pertaining to

---

[8] Per the terms of the agreement in this case, amendments to the loan agreement would only be accepted in writing and with written consent of the parties. (Cruse Decl., Ex. 1 at 7).

unsegregated liens, liens which contained correctly included items, *i.e.* lienable items, and incorrectly included items, *i.e.* nonlienable items. *Hays v. Pigg*, 267 Or. 143, 147-48 (1973). The *Hays* court encountered a conflict in rules pertaining to unsegregated liens. *Id.* at 147-48. One rule stated that if a lien contained overstatements, *i.e.* nonlienable items, made in good faith, then the lien would be allowed only to the extent of the correct lien amount, and the lien would be invalidated only if intentional conduct or culpable negligence was shown in a liens preparation. *Id.* at 147. Another rule provided that if extrinsic evidence was required to determine what was lienable and nonlienable, then the right to the lien was forfeited in its entirety. *Id.* at 148.

The *Hays* court held, in the context of unsegregated liens, that when the "nonlienable charge is extremely small as compared to the total item in which it is included, and if it is inserted without malicious intent, the rule of *De minimis non curat lex* should apply." *Hays*, 267 Or. at 149.[9] The lien before the *Hays* court included a nonlienable amount of $21, and in applying the rule of *De minimis non curat lex*, the court reasoned that "small errors are bound to exist in any lien filed upon a construction project of any considerable size." *Id.* at 149. Contrary to the Clauses' invocation of this doctrine, the purpose of invoking this doctrine was to resolve a conflict in the law that allowed for a nonlienable amount, no matter how small, to invalidate an otherwise valid lien. *Id.* The cited authority and subsequent case law are directly concerned with determining the validity of a lien in the context of an unsegregated lien. *See Knez Bldg. Materials Co. v. Bell-Air Estates, Inc.*, 144 Or. App. 392, 397-98 (1996) (stating the *Hays* court's holding provides "that nonlienable items in an unsegregated lien will not destroy the lien if those nonlienable items are *extremely small* in relation to the total unsegregated lien claim) (emphasis in original).

---

[9] *"De minimis non curat lex"* is Latin for the phrase "the law does not concern itself with trifles." *Halperin v. Pitts*, 241 Or. App. 249, 254 (2011), *rev'd*, 352 Or. 482, 287 P.3d 1069 (2012).

This is not the case here. The mere validity or invalidity of a lien does not absolve the contractual requirements stated above, let alone support the excuse of the written notice requirement. Though the Clauses do not explain how the *De minimis non curat lex* doctrine is applicable, this doctrine would only be applicable in contesting the validity of lien that includes an *extremely small* amount in relation to the remainder of the lien. The Clauses do not argue that the liens filed against the properties were sufficiently small to trigger the doctrine of *De minimis non curat lex*. Even if the argument were such, that an *extremely small* nonlienable item is included with a lienanble item does not address the Clauses' contractual obligation of providing written notice to initiate a good faith dispute per the terms of the Loan Agreement.

In short, the factual allegations – that the Clauses proffered a lien settlement of $150,000, that Columbia refused the offer, and that Columbia was aware of the liens, writ, and judgment – do not support an inference either that the Clauses transmitted written notice to Columbia per the terms of Loan Agreement or that Columbia failed to perform a duty under the agreement. Moreover, the doctrine of *De minimis non curat lex* is not applicable and does not provide legal excuse for the Clauses' failure to perform under the Loan Agreement. Consequently, the Clauses have failed to provide factual allegations to state a claim for a breach of contract. Accordingly, the motion to dismiss is granted with respect to the breach of contract claim.

*Analysis of Newly Asserted Claims*

I.     Federal Rule of Civil Procedure 15 Analysis

The Clauses argue that because the newly added claims are based on the same set of operative facts and "directed at the [same] harm caused by untrue statements" as the original claims, Columbia would not be subject to undue prejudice or undue delay. (Mem. in Supp. at 2-3.) Though stated without further explanation, the Clauses argue that they have not engaged in bad faith, undue delay, and that Columbia would not suffer undue prejudice. (*Id.* at 3.) In

response, Columbia argues that the newly added claims fall outside of the leave granted in the court's opinion and order and should be dismissed. (Def. Resp. to Pl. Mot. to Accept First Am. Compl., ECF No. 81 ("Def. Resp.") at 4.) Alternatively, Columbia argues that the addition of newly asserted claims should still be dismissed because of undue delay, bad faith, or futility of amendment. (*Id.* at 5.)

Discussed *supra*, Federal Rule of Civil Procedure 15(a)(2) provides that the "court should freely give leave [to amend a pleading] when justice so requires." The rule should be applied "favoring amendments . . . with extreme liberality." *Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000) (quotation marks omitted). A court may, however, deny a motion to amend "due to undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (alteration in original). But, these factors are not weighed equally, "[a]s the Ninth Circuit and other circuits have held, it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). The burden of showing prejudice is on the party opposing amendment. *DCD Programs, Ltd. v. Leighton*, 833 F.3d 183, 187 (9th Cir. 1987). Futility of amendment, however, "can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

Accordingly, before the court addresses Columbia's argument on denying leave to amend, the court must first determine whether newly added claims fall outside the scope of the court's prior order granting leave to amend.

/ / / / / /

A.      Scope of Leave to Amend

Columbia argues newly added claims fall outside the scope of the court's prior order granting leave to cure deficiencies in the Clauses' original complaint.  Claims that are newly asserted on an amended complaint and are outside the court's initial scope of leave to amend should be stricken or dismissed.  *U.S. Bank National Ass'n as Trustee for Greenpoint Mortgage Funding Trust Pass Through Certificates Series 2006-AR4 v. Edwards*, No. 03:15-cv-01307-AC, 2018 WL 4621920, at *4 (D. Or. Aug. 28, 2018).  However, if the court's order does not expressly limit leave to amend to only the existing claims, the court can consider newly asserted claims in the amended complaint.  *See Gilmore v. Union Pac. R. Co.*, No. 09-CV-02180-JAM-DAD, 2010 WL 2089346, at *4 (E.D. Cal. May 21, 2010) (finding that plaintiff was not required to seek leave to amend when: plaintiff asserted new claims, defendants did not demonstrate prejudice by the addition of the claim, and the court did not limit leave to amend to only the existing claims); *see also Topadzhikyan v. Glendale Police Dep't,* No. CIV 10-387 CAS (SSX), 2010 WL 2740163, at *3 n. 1 (C.D. Cal. July 8, 2010) (declining to strike new claims where court granted leave to amend without limitation); *but cf. Andrew W. v. Menlo Park City Sch. Dist.*, No. C-10-0292 MMC, 2010 WL 3001216, at *2 (N.D. Cal. July 29, 2010) (finding that a court's prior order did not give express leave to add new claims or defendants, but rather granted leave to amend deficiencies in specified claims).

Here, the court dismissed the Clauses' original complaint with leave to amend and further noted the facts necessary to state a claim for negligence, breach of contract, and fraud.  (Op. and Order at 32-33.)  The court did not include express language limiting leave to amend to only the then-asserted claims.  Rather, the court granted leave to amend and noted what facts would be necessary to state a claim for the claims brought before the court at that time.  Accordingly, the court finds that the newly added claims do not exceed the scope of the court's order granting leave

to amend and should not be dismissed simply by virtue of being newly asserted in the amended complaint.

B.     Undue Delay

Columbia argues that the newly added claims should be dismissed for undue delay because the Clauses were "aware of the same set of facts on which their new claims are based" at the time the Clauses filed their original complaint. (Def. Resp. at 5.) Moreover, Columbia argues that two-and-one-half years between the original complaint and amendment would constitute undue delay. (*Id.*)

Delay, alone, is not sufficient to deny leave to amend absent a finding of undue prejudice, bad faith, or futility. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citing *Hurn v. Ret. Fund Tr. of Plumbing, Heating & Piping Indus. of S. California*, 648 F.2d 1252, 1254 (9th Cir. 1981)); *but cf. Schlacter-Jones v. Gen. Tel. of California*, 936 F.2d 435, 443 (9th Cir. 1991), *abrogated on different grounds by Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683 (9th Cir. 2001) (finding that the timing of the motion for leave, which was filed after close of discovery and with a pending motion for summary judgment, weighed heavily against granting leave); *and Field Turf Builders, LLC v. FieldTurf USA, Inc.*, No. 03:09-CV-671-HZ, 2011 WL 13250936, at *2 (D. Or. Dec. 16, 2011) (denying plaintiffs' motion for leave to amend in light of motion being filed two and a half years after original complaint, but after close of discovery and order granting summary judgment in favor of defendant).

The court disagrees with Columbia that leave to amend should be denied solely because the claims are now asserted on the first amended complaint two and half years after the original complaint. Though the Clauses were aware of the facts alleged in the newly asserted claims, leave to amend should be granted with extreme liberality, and the passage of time, alone, is not sufficient to constitute undue delay. When leave to amend is denied due to delay, the court is primarily

concerned with unnecessary extension of litigation that would likely reach resolution but for the leave sought. This is not the case here as the Clauses' filing of newly asserted claims would not unnecessarily extend litigation, i.e. cause undue delay. Moreover, leave to amend has been denied when discovery has closed, and summary judgment motions were either granted or pending. Though there have been dispositive motions before this court, discovery has not closed, and Columbia has failed to carry its burden on demonstrating prejudice. Accordingly, the lapse of time, alone, in asserting new claims does not rise to the level of undue delay. Delay, however, could support denying leave where the court finds bad faith, or the newly asserted claims are futile.

C.    Bad Faith

The Clauses argue, without further explanation, that the newly asserted claims were not made in bad faith. In response, Columbia argues the Clauses have engaged in bad faith because the amendment is an attempt to circumvent the statute of limitations for the negligent misrepresentation claim. (Def. Resp. at 5.) Columbia argues that ORS 12.110(1) provides a two-year statute of limitations for claims of negligent misrepresentation, and that granting leave to add the negligent representation claim would be unfairly prejudicial to Columbia. (*Id.*)[10]

In the context of a motion for leave to amend, bad faith exists "when the addition of new legal theories are baseless and presented for the purpose of prolonging the litigation . . . or when the adverse party offers evidence that shows wrongful motive on the part of the moving party." *Axial Vector Engine Corp. v. Transporter, Inc.*, No. CIV. 05-1469-AC, 2008 WL 4547795, at *4 (D. Or. Oct. 9, 2008) (citations omitted) (internal quotations omitted).

---

[10] This reference to undue prejudice is the only instance where Columbia argues that amendment would result in undue prejudice, but Columbia does not expand on this point.

Though it is arguable that the Clauses' filing of an amended claim to circumvent the statute of limitations can be evidence of bad faith, Columbia has not demonstrated, apart from conclusory assertions, that this is the case here. The statute of limitations for a negligent misrepresentation claim is two years, but an amendment can relate back to the date of the original pleading when the "amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out-- or attempted to be set out--in the original pleading . . . ." *Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 308 (2007) (stating the statute of limitations for negligent misrepresentation is two years); FED. R. CIV. P. 15(c)(1)(B).

Moreover, as the Ninth Circuit has held, Federal Rule of Civil Procedure 15(c)(1) "requires us to consider both federal and state law and employ whichever affords the more permissive relation back standard. *Butler v. Nat'l Cmty. Renaissance of California*, 766 F.3d 1191, 1201 (9th Cir. 2014). "Both FRCP 15(c)(1)(B) and ORCP 23(c) call for the amended pleading to relate back when the claim set out in the amended pleading arises out of the 'conduct, transaction, or occurrence' set forth, or attempted to be set forth in the original pleading." *Dillon v. Clackamas Cty.*, No. 3:14-CV-00820-YY, 2018 WL 4523139, at *9 (D. Or. May 2, 2018), *report and recommendation adopted*, No. 3:14-CV-820-YY, 2018 WL 3539438 (D. Or. July 23, 2018).

Though the amended complaint was filed approximately less than two months after the two-year statute of limitations ran, the mere fact that the statute of limitations may be applicable is not, alone, enough to find bad faith on part of the Clauses. Columbia has neither demonstrated that the Clauses filed the newly asserted claims to prolong litigation nor that the Clauses acted with a wrongful motive. The court has granted multiple motions to extend time to file the amended complaint to accommodate the Clauses' health conditions. The amended complaint having been filed within the time period of the granted extensions, but falling outside of the statute of

limitations for some claims by only a few weeks, hardly supports a finding of bad faith on part of the Clauses. Accordingly, there is insufficient evidence to find that the Clauses have engaged in bad faith.[11]

D.    Futility of Amendment

Lastly, Columbia argues leave to amend should be denied because the newly asserted claims are futile. (Def. Resp. at 5.) A claim is futile "if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). The test for futility is the standard used for a Rule 12(b)(6) motion to dismiss. *Fulton v. Advantage Sales & Marketing, LLC*, No. 3:11-cv-01050-MO., 2012 WL 5182805 at *2 (D. Or. Oct. 18, 2012). As described above, a plausible claim has "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Accordingly, the court will asses whether the newly asserted claims are futile.

1.    Negligent Misrepresentation

To state a claim for negligent misrepresentation under Oregon law, a plaintiff must allege: "(1) a special relationship between plaintiff and defendants; (2) that defendants failed to exercise reasonable care by negligently making false representations or omitting material facts; (3) plaintiff's reasonable reliance on those false representations or omissions; and (4) damages sustained by plaintiff." *Vigilante.com, Inc. v. Argus Test.com, Inc.*, No. CV04-413-MO, 2005 WL 2218405, at *16 (D. Or. Sept. 6, 2005) (citing *Conway v. Pacific University*, 324 Or. 231, 241, 924 P.2d 818 (1996)). The only disputed element is whether the Clauses have alleged a special relationship between themselves and Columbia.

---

[11] Columbia did not offer arguments for bad faith of the other newly asserted claims.

The Clauses argue they have sufficiently pleaded a special relationship with Columbia because they alleged facts demonstrating Columbia went beyond the normal lender-borrower relationship by voluntarily committing to administer financial management of the project; creating an initial development plan; negotiating contracts between SHB and the Clauses; selecting and evaluating SHB; and disbursing funds requested by SHB. (Am. Compl. ¶ 50.) The Clauses further allege that Columbia's predecessors provided services that were outside the scope of normal banking business activities, such as financial advisement, from 1980 to 1995, approximately two decades before Columbia purchased the predecessor bank. (Am. Compl. ¶ 5.) Additionally, the Clauses allege that West, the immediate predecessor to Columbia, made the promise to provide financial oversight of the development project. (Am. Compl. ¶ 9.) Columbia argues the Clauses' allegations could not support a finding of a special relationship because, at most, the Clauses entered into an arms-length transaction with Columbia. (Def. Reply to Pl. Resp. to Def. Mot. to Dismiss Pl. First Am. Compl., ECF No. 92 ("Def. Reply") at 4.) Additionally, Columbia argues that the alleged promise made by Defendant to provide financial oversight of the project does not, by itself, create a special relationship because the special relationship would have had to exist prior to the alleged promise being made. (*Id.*)

Certain professional relationships, such as lawyer-client, physician-patient, engineer-client, and agent-principal, have been recognized as special relationships. *Conway*, 324 Or. at 240-41; *see also Eulrich v. Snap-On Tools Corp.*, 121 Or. App. 25, 36, 853 P.2d 1350, 1358 (1993), *cert. granted, judgment vacated,* 512 U.S. 1231, 114 (1994) (listing physician-patient, lawyer-client, architect-client, insurer-insured and agent-principal relationships as recognized special relationships). If the relationship at issue is not of the type explicitly recognized, whether a special relationship exists depends on "the nature of the parties' relationship . . . [in comparison]

to other relationships in which the law imposes a duty on parties to conduct themselves reasonably. . . ." *Onita Pac. Corp. v. Tr. of Bronson*, 315 Or. 149, 160 (1992).

To determine if a relationship amounts to a special relationship, courts consider whether: "(1) [o]ne party relinquishes control over matters, usually financial, and entrusts them to the other party, (2) [t]he party with control is authorized to exercise independent judgment; (3) in order to further the other party's interests; and (4) [t]he relationship either is, or resembles, other relationships in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship." *Bell v. Pub. Emps. Ret. Bd.*, 239 Or. App. 239, 249-50, 247 P.3d 319 (2010) (citations omitted). Notably, though the recognized special relationships are of a fiduciary nature, the mere act of relinquishing control over responsibilities does not trigger the heightened duty of a special relationship. *See Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or. 97, 110 n.7 (1992) (reasoning that a claim for breach of fiduciary duty and claim for breach of duty arising from a special relationship is the same in nature); *see also Bennett v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 161-62 (2001) (stating that a tort duty is not imposed on a party simply because "one party to a business relationship begins to dominate and to control the other party's financial future," but rather the analysis for special relationship cases focuses on "whether *nature of the parties' relationship itself* allowed one party to exercise control in the first party's best interests") (emphasis in original).

Put another way, a special relationship is characterized by one party "acting, at least in part, to further the economic interests of the other party," and the acting party having an obligation to pursue those economic interests of the other party. *Conway*, 324 Or. at 236-37; *but compare Roberts v. Fearey*, 162 Or. App. 546, 554, 986 P.2d 690, 695 (1999) (refusing to hold that one party acting to further the economic interests of the other party, standing alone, establishes a

special relationship as a matter of law). Essentially, if one party "stands in the shoes" of the other party, the economic interests of the parties are sufficiently intertwined such that the stand-in party has a special responsibility to the other. *See Loosli v. City of Salem*, 215 Or. App. 502, 508, *aff'd*, 345 Or. 303 (2008) (noting that the *Georgetown* court held that when an insurer agreed to defend the insured, the insurer effectively "[stood] in the shoes of the insured" such that the insured entrusted its potential liability to the insurer).

The Clauses entered into a Loan Agreement with Columbia, which rendered their relationship that of creditor and debtor. The creditor-debtor, or lender-developer, relationship is not of a similar nature to those special relationships explicitly recognized by the Oregon Supreme Court. *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.,* 320 Or. 638, 650 (1995). However, a special relationship can be found in the lender-developer context when past dealings either are of a fiduciary nature or result in a modification to the loan agreement. *Uptown*, 320 Or. at 650.

The only activity alleged that imposes a fiduciary duty is financial advisement, but it is not alleged that Columbia, or even the immediate predecessor, West, engaged in this activity with the Clauses. *See Wallace v. Hinkle Nw., Inc.*, 79 Or. App. 177, 181 (1986) (stating that a fiduciary duty exists when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence"); *see also Kelly v. Lessner*, 224 Or. App. 31, 36-37, 197 P.3d 52, 55 (2008) (holding that plaintiff's claim for breach of fiduciary duty against defendant, who gave plaintiff damaging financial advice, should not have been dismissed). Taking the allegation as true, even if the services provided by Columbia's predecessors constituted a fiduciary relationship, it could not extend to Columbia given nearly twenty years between that prior relationship and Columbia's relationship with the Clauses. *Compare Roberts*, 162 Or. App. at 554-55 (holding that the

fiduciary duty that an attorney owes a client-trustee when advising on matters related to the trust does not extend to the trust itself and successor trustees); *with Delaney v. Georgia-Pac. Corp.*, 278 Or. 305, 310-11, *supplemented*, 279 Or. 653 (1977) (stating that the fiduciary duties owed by joint venturers continued throughout the parties' relationship, but later documents and agreements can alter prior fiduciary duties).

Alternatively, Columbia's predecessor, West, could have altered the Loan Agreement, but, as discussed *infra*, the promise to oversee the financial management of the development was not reflected in the Loan Agreement.[12] Even if the promise made by West served as a modification to the Loan Agreement, the modification would not have altered the nature of the parties' relationship, which is the focus of special relationships analysis. *See Bennett*, 332 Or. at 161-62 (reasoning that although the *Georgetown* court found that the insurer stepped-in for the insured and controlled the "subject matter" of the relationship, such as the insured's financial liability, the focus of special relationships is not on the subject matter, or even if control is relinquished, but rather it is on the nature of the relationship, which allows for the relinquishing of control). When one party "stands in the shoes" of another party, the stand-in party would be equally as harmed as the other party if the stand-in party does not act with the heightened duty of care. *See Georgetown*, 313 Or. at 110–11 (noting that when the insurer agreed to defend the insured, the insured's, and ultimately the insurer's, monetary liability is in the hands of the insurer").

Unlike *Georgetown*, Columbia assuming financial oversight of the project does not intertwine the parties' economic interests like that of recognized special relationships. Though the

---

[12] "[A] written agreement invalidates all prior and contemporaneous oral agreements that are inconsistent with the written agreement." *Howell v. Oregonian Pub. Co.*, 82 Or. App. 241, 245, 728 P.2d 106, 108 (1986), *opinion modified on reconsideration*, 85 Or. App. 84, 735 P.2d 659 (1987); *see also* analysis in section V(A). Here, the prior oral agreement is inconsistent with the explicit terms of the contract that was entered into after the oral promise.

economic interests of Columbia and the Clauses may point toward a shared goal, *e.g.* the completion of a development project to repay a loan, the promise of financial oversight does not intertwine the interests such that one party "stands in the shoes" of the other. For example, even if Columbia negligently mismanaged the finances of the development, their economic interests would still be preserved because the loan was secured by a deed of trust on the property. Conversely, when an insurer defends an insured, the successful defense of the insured directly impacts the economic interests of both parties to the same extent because the insurer is ultimately paying for any liability.

Moreover, a heightened duty is not imposed on Columbia simply because the Clauses granted financial control over certain aspects of the project. The mere act of relinquishing control over responsibilities in a transaction and the fact that one party is granted control over another's financial future are not sufficient to find a special relationship, which is the case here.

Lastly, the Clauses point to the drafting of a development plan and negotiation of contracts between the Clauses and SHB as support a special relationship exists here. If true, such conduct could support the existence of a principal-agent relationship, which is a recognized special relationship under Oregon law. *Conway*, 324 Or. at 240-41. However, "an agency relationship exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 617, 892 P.2d 683 (1995). West's original promise to provide financial oversight of the project prior to the execution of the Loan Agreement between the Clauses and Columbia could support a principle-agent relationship, but the subsequent contractual documents do not show a manifestation by Columbia to serve as the Clauses' agent. Moreover, the Clauses fail to allege facts indicating Columbia agreed to act as their agent in negotiations and drafting. Consequently,

because no facts alleged could support the inference that Columbia assented to act as the Clauses' agent, apart from conclusory assertions, the Clauses fail to sufficiently allege a principal-agent relationship.

For the reasons stated above, the Clauses have not pleaded sufficient facts to establish a special relationship between the parties. Accordingly, the motion to strike is granted.

### 2. Breach of the Obligation of Good Faith and Fair Dealing

The Clauses allege that Columbia encouraged the Clauses to enter into a relationship beyond that of a typical lender-borrower relationship by taking complete control of the management of the project and the Clauses' economic interests. (Am. Compl. ¶ 54.) Additionally, the Clauses allege that they had the "right to rely on Columbia's non-negligent performance" because they had explicitly authorized Columbia to administer critical aspects of the development project. (Am. Compl. ¶ 54.) Because Columbia acted in bad faith by negligently administering the project and pursuing creditor remedies, the Clauses suffered damages as a result. (*Id.* ¶ 55.)

Every contract includes an implied duty of good faith and fair dealing. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 615, 892 P.2d 683 (1995). Yet, that duty does not alter the interpretation of the contract or insert new terms into the contract. *W. Prop. Holdings, LLC v. Aequitas Capital Mgmt., Inc.*, 284 Or. App. 316, 324-25 (2017) (citation omitted). Similarly, the "duty [of good faith and fair dealing] cannot expand the parties' substantive duties under a contract; rather, it relates to the performance of the contract." *Gibson v. Douglas Cty.*, 197 Or. App. 204, 217 (2005). The duty of good faith and fair dealing, thus, "emphasizes faithfulness to an agreed common purpose and is designed to effectuate the reasonable contractual expectations of the parties." *Workshops Portland Carson, L.L.C. v. Carson Oil Co.*, No. 3:15-CV-01234-AC, 2017 WL 1115164, at *4 (D. Or. Mar. 24, 2017) (citation omitted) (internal quotation omitted). To

determine whether contractional expectations are reasonable, the court looks to the express terms of the agreement. *Pacific First Bank v. New Morgan Park Corp.*, 319 Or. 342, 353-54 (1994).

Here, the implicit argument the Clauses present is that the promise to financially administer the project was an incorporated oral amendment to the contract. Finding otherwise would mean that the promise was not part of the "express terms of the agreement." Consequently, it would not be a "reasonable contractual expectation of the parties." As discussed above, the promise to financially administer the development project was made by West, Columbia's predecessor, and it is alleged that West "would monitor the progress of the construction and see that the contractor, subcontractors, and suppliers" were paid. (Am. Compl. ¶ 9.)

Though oral agreements that amend written agreements can be accompanied by the duty of good faith and fair dealing, evidence of parties' consent to the amendment is required. *See Iron Horse Eng'g Co. v. Nw. Rubber Extruders, Inc.*, 193 Or. App. 402, 406-07, 419-20 (2004) (finding that parties' oral amendments made after the initial written agreement were incorporated into the agreement between the parties, that the duty of good faith applied to the oral amendment, and that evidence from testimony and written communications supported the oral amendment to the contract).

In this case, however, the oral promise was made prior to the written loan agreement and was not explicitly referenced in the Loan Agreement. Even if the promise could constitute an amendment without reference in the Loan Agreement, the express terms of the Loan Agreement require amendments to be in writing and with written consent of both parties. (Cruse Decl., Ex. 1 at 7.) Thus, the promise by West to financially administer the project is not an express term of the Loan Agreement, and the performance related to any alleged financial management of the project would not fall within the reasonable contractual expectations of the parties. Even taking the

Clauses' allegations as true, the facts are insufficient to infer the alleged promise proffered by West was an express term of the agreement with Columbia.

Because the promise by West is not an express term of the contract, the Clauses would state a claim for breach of good faith and fair dealing only if the creditor remedies pursued by Columbia were in breach of the duty of good faith. Instructive on this point is *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638 (1995). In that case, the lender-bank defendant, Seafirst, entered into a loan agreement with borrower-developer, Uptown, for the purpose of Uptown developing a high-end apartment complex in Portland, Oregon. *Id.* at 641-42. Under the terms of the agreement, which was secured by a deed of trust on the property, Uptown was required to make monthly interest payments until the date of maturity, which would require full payment of the principle amount. *Id.* at 642. The rental market subsequently experienced a downturn, and Uptown had difficulty making the monthly interest payments, constituting default. *Id.*

Thereafter, Uptown negotiated an extension of the loan with Seafirst to hope to sell the property and recoup some of the investment. *Id.* at 643. Uptown informed Seafirst that if it commenced foreclosure proceedings, such proceedings would materially impact Uptown's opportunity to sell the property. *Id.* Despite assurances to the contrary, Seafirst initiated foreclosure as expressly permitted by the agreement when Uptown defaulted and refused to postpone the proceedings, though Uptown was in the process of securing a second potential buyer. *Id.* at 642-44. Ultimately, Seafirst sold the property in the foreclosure sale, and Uptown filed suit. *Id.* 643-44.

The Oregon Supreme Court held that Seafirst did not breach its duty, reasoning that the mere invocation of an express written contractual right does not violate the duty of good faith and fair dealing. *Id.* at 645. Because Uptown defaulted on the loan, Seafirst was fully within its

contractual rights to foreclose. *Id.* at 647-48. Though the circumstances were outside of Uptown's control, the court determined that Seafirst's refusal to extend the loan did not amount to a breach of duty of good faith. *Id.* However, the *Uptown* court contemplated factual scenarios, if alleged by Uptown, that may have supported a claim: whether Seafirst (1) "*caused the default* to occur" or (2) did not follow the "proper *method* of foreclosure." *Id.* at 645 (emphasis in original).

Here, the Loan Agreement between the Clauses and Columbia provided foreclosure as a remedy in the event of a default. Similar to Seafirst, Columbia was aware of the circumstances that resulted in the incorrect writ and judgment and various liens filed on the property, all of which were outside the control of the Clauses. Moreover, as the Oregon Supreme Court determined in *Uptown*, Columbia's refusal of an offer to remedy a default does not, in and of itself, constitute a breach of good faith. Indeed, the *Uptown* court's holding did not provide that circumstances leading to default outside a borrower's control vitiate a party's contractual right to foreclose on a property. As *Uptown* holds, a lender's refusal to accommodate a borrower's attempts to remedy a default does not necessarily breach the duty of good faith. Moreover, the duty of good faith here does not create an affirmative duty to act on behalf of the Clauses, whether it be to mitigate damages caused by SHB or proffer a subcontractor list.

However, the *Uptown* court did suggest that when the bank is the cause of the default or uses an incorrect method of foreclosure, a plaintiff may state a claim for breach of duty of good faith. The Clauses argue Columbia's selection of SHB, the negligent management of the project, the lack of action to remedy the damages caused by SHB, and the refusal to provide a list of subcontractors after SHB left the project, contributed to, if not caused, the default. (Pl. Resp. at 7.) The factual scenarios contemplated by the *Uptown* court suggest that the bank not only would need to act intentionally, but also in bad faith, to be considered the *cause* of the default. *See*

*Uptown*, 320 Or. at 650 (finding that, absent a special relationship, the bank did not breach its duty of good faith despite the bank's use of "aggressive sales tactics, [] commercial use of its customer relationship with Uptown, and that its employees sought advancement from that commercial relationship"). This is not what is alleged here. Even taken as true, Columbia's conduct could not be both the negligent and intentional cause of the default.

Though the Clauses do not argue as much, their argument regarding the maturation of the promissory note could support the second factual scenario contemplated by the *Uptown* court. Columbia argues that the maturation of the promissory note was an independent basis for Columbia to initiate foreclosure proceedings. The Clauses argue that the date of maturity was actually 2024, and by initiating foreclosure proceedings prior to 2024, Columbia improperly initiated foreclosure proceedings. There is a fact discrepancy with respect to the loan's maturity date. Columbia asserts that the 2024 date is a clerical error, and that the actual maturation date is October 8, 2014. However, even taking the Clauses' argument as true, *i.e.* the maturity date is 2024, Columbia was still within its right to initiate foreclosure proceedings prior to 2024 because Columbia could accelerate the maturity of the loan in the event of a default. (Cruse Decl., Ex. 1 at 6; Cruse Decl., Ex. 2 at 4.) Thus, initiating foreclosure proceedings prior to 2024 would not breach the duty of good faith because accelerating the maturity date was Columbia's express contractual right and was not an improper method of foreclosure.

Additionally, the Clauses argue that a party that exercises discretion in a manner not contemplated by parties has performed in bad faith. (Pl. Resp. at 8). The Clauses rely on *Best v. U.S. Nat. Bank of Oregon*, 303 Or. 557, 563, 739 P.2d 554 (1987) (stating that exercise of discretion that falls outside the "purposes not contemplated by the parties" constitutes bad faith). However, when a lender retains unilateral discretion to decide when to initiate appropriate

foreclosure proceedings, Oregon courts have held that this exercise of discretion does not constitute bad faith. *W. Prop. Holdings, LLC v. Aequitas Capital Mgmt., Inc.,* 284 Or. App. 316, 329, 392 P.3d 770 (2017) (holding that "plaintiff could not reasonably expect that defendant would account for plaintiff's interests or preferences in deciding whether to foreclose" when the agreement gave that express right to defendant to determine); *see also Uptown,* 320 Or. at 647–48 (holding that a bank's unilateral exercise of discretion to foreclose was reasonably expected under the terms of the agreement).

Here, Columbia's conduct does not constitute bad faith in exercising its discretion to initiate foreclosure proceedings, because that possibility was reasonably expected by the parties under the terms of the agreement. That its conduct was to the detriment of the Clauses is of no consequence, because the right to foreclose was expressly granted to Columbia by the Loan Agreement.

For the reasons stated above, Columbia was within its contractual rights to initiate foreclosure proceedings. Columbia's decision not to provide the Clauses with a list of subcontractors and to refuse a settlement offer does not constitute bad faith. Moreover, because the promise to financially manage the project was not an express term of the agreement, it is not a reasonable expectation of the parties to which the duty of good faith applies. The Clauses, thus, have failed to state a claim for breach of good faith and fair dealing. Accordingly, the motion to dismiss is granted with respect to the claim of breach of good faith and fair dealing.

3.    Promissory Estoppel

Columbia argues that both actual consideration and the express terms of the agreement defeat the promissory estoppel claim. (Def. Mot., at 15-16.) Additionally, Columbia argues that the Clauses fail to allege how their position changed because of the promise and whether the change was substantial or foreseeable. (Def. Mot., at 15.) The Clauses respond by arguing that

the promise prior to the agreement is the basis of the promissory estoppel claim and that their position changed because their ranch property was sold in consideration of the loan and they were "forced to accept" an "uncreditworthy and dishonest" contractor. (Pl. Resp., at 10-11.) Moreover, the Clauses argue that Columbia's assumption of oversight responsibilities constituted a waiver that those responsibilities were on the Clauses. (Pl. Resp., at 11.)

To state a claim of promissory estoppel, the Clauses are required to allege: "(1) a promise, (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred, (3) actual reliance on the promise, (4) resulting in a substantial change in position." *Rick Franklin Corp. v. State ex rel. Dep't of Transp.*, 207 Or. App. 183, 190, 140 P.3d 1136 (2006) (quoting *Bixler v. First National Bank*, 49 Or.App. 195, 199-200, 619 P.2d 895 (1980)). The court addresses the parties' arguments on actual consideration, substantial change in position, and waiver.

a.     Actual Consideration

In Oregon, it is well recognized that promissory estoppel is not a "cause of action." *Neiss v. Ehlers*, 135 Or. App. 218, 227-28, 899 P.2d 700 (1995). Rather, promissory estoppel is "a substitute for consideration" and is a basis for enforcement, despite a lack of consideration, "when the promisee has relied on a promise to his or her detriment." *City of Ashland v. Hoffarth*, 84 Or. App. 265, 270, 733 P.2d 925, *rev. den.* 303 Or. 483 (1987). "[P]romissory estoppel can only become necessary as a remedy for an unperformed promise if no traditional contractual remedy is available for the nonperformance." *Neiss*, 135 Or. App. at 228. Moreover, "the applicability of promissory estoppel should depend generally on why the promise is contractually unenforceable . . . ." *Id.* at 229. However, there is no colorable claim of promissory estoppel where there is actual consideration. *Hill v. Mayers*, 104 Or. App. 629, 631-32, 802 P.2d 694 (1990).

Columbia argues that because its prior promise was not incorporated into the loan agreement, which was made with actual consideration, there is no viable basis for promissory estoppel. Accordingly, the court must determine whether the oral promise was superseded by the subsequent written agreement. If so, the inquiry ends as the written agreement would be operative; if not, the question then is whether there are sufficient facts to determine if there was actual consideration for the promise to administer the project.

Instructive on this point is *Greenwade v. Citizens Bank of Oregon*, 50 Or. App. 395, 624 P.2d 610 (1981). In *Greenwade*, the plaintiff sought a loan from the defendant to build a residence in Lane County. *Id.* The plaintiff ultimately obtained a construction loan from the defendant for $34,900, in exchange for a promissory note secured by a trust deed on the property. *Id.* The disclosure statement in the loan contained a reference to a "one percent charge" for $348 that plaintiff paid defendant. *Id.* Plaintiff testified that the fee was paid in consideration for an oral promise, made by the defendant through its loan officer, "prior to signing of the written documents." *Id.* The promise was that defendant "would manage the loan fund to ensure that disbursements were made commensurate with the stage of completion of the building." *Id.* The oral agreement also carried an obligation that defendant would pay the contractor only after consulting plaintiffs and inspection of the property and that defendant would obtain from the contractor a guarantee that the building cost would not exceed the loan amount. *Id.*

The *Greenwade* court reasoned that the prior oral agreement was not superseded by the subsequent written loan agreement if the oral terms were "not inconsistent" with the written terms and if "(1) the oral agreement was made for a separate consideration, or (2) if the oral agreement is . . . naturally [] made as a separate agreement by parties" similarly situated. *Id.* at 399 (internal quotations omitted) (citation omitted).

Here, the oral promise regarding financial administration of the project was allegedly made prior to the execution of the Loan Agreement. The Loan Agreement contains express language that it is fully integrated. (Cruse Decl., Ex. 1, at 7.)[13] Moreover, the subject of the oral agreement, Columbia's administration of disbursements, is inconsistent with the disbursement procedures set forth in the written Loan Agreement. (Cruse Decl., Ex. 1, at 3.) Accordingly, the Loan Agreement is fully integrated, and the oral agreement is not part of the contractual obligations of the parties.

Even if, however, the oral agreement was not superseded by the Loan Agreement, the Clauses' claim still would fail. Though the Clauses argue the promise made prior to the Loan Agreement is the basis of the promissory estoppel claim, there was actual consideration in the alleged oral agreement even if the oral agreement was not superseded by the Loan Agreement. Indeed, the Clauses claim they paid Columbia $18,000 for "administrating and processing the line of credit over the life of the project, with such administration to include builder oversight, disbursement of funds, and contract approval." (Am. Compl. ¶ 24.) Accordingly, there are sufficient facts to conclude there was actual consideration in the oral agreement, barring a claim of promissory estoppel.

b.     Substantial Change in Position

The Clauses argue that as a result of the oral promise they experienced a substantial change in position when they sold property at a loss as a condition for the loan. However, it is not clear from the allegations that the sale of the property resulted from the promise to administer the project. As alleged, "West Coast Bank required that the Clauses sell their Oregon ranch property before it would make a loan." (Am. Compl. ¶ 11.) Presumably, if the sale of the property was

---

[13] The language is found in the Amendments section and reads, "This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in the Agreement." (Cruse Decl., Ex. 1 at 7).

consideration for the loan, then it would not have been a substantial change in position because the Clauses obtained the loan after selling the ranch. *See Bixler v. First Nat. Bank of Oregon*, 49 Or. App. 195, 200, 619 P.2d 895 (1980) (holding that promissory estoppel applied when a plaintiff, relying on the promise of a bank that the bank would lend $55,000 for plaintiff to purchase a farm, invested money and labor into the farm, and the farm was ultimately sold to another buyer because the bank refused to lend the promised monies).

The Clauses allegedly sold the ranch to get the loan for the development project. Thus, the court can infer the sale of the ranch was not made in reliance on Columbia's promise to administer the project, but rather to obtain the loan for which there was consideration. Additionally, the Clauses being "forced to accept" SHB does not constitute a substantial change in position because it does not result from any alleged actual reliance on Columbia's promise to administer the project. Whether the Clauses were forced to accept SHB is not a result of Columbia's promise to administer the project, but rather within the terms of the agreement, under which the Clauses were not precluded from offering another general contractor for Columbia's approval. (Cruse Decl., Ex. 1 at 2.) Accordingly, the Clauses have not alleged sufficient facts to meet the substantial change in position element.

### c. Waiver

Lastly, the Clauses argue that Columbia's assumption of responsibility waives the Clauses' requirements to provide financial oversight of the project. Although waiver of a contract provision is applicable in the context of estoppel, determining who the waiving party is and the timing of the relied-on assertions is important. In *Bennett v. Farmers Ins. Co. of Oregon*, the plaintiff entered into a district manager's appointment agreement with defendants. 332 Or. 138, 142 (2001). The agreement stated that plaintiff, who was newly promoted to district manager, could be fired without cause and that parties could modify or amend the contract only in writing and with the

parties' consent. *Id.* at 142-43. Because of allegedly poor performance, plaintiff was placed on a "performance plan" aimed at improving plaintiff's performance. *Id.* at 143-44. Plaintiff testified that various representations were made to plaintiff during his time as district manager that he would be fired only if he "lied, cheated, or stole," and so, plaintiff understood that he could only be fired for cause. *Id.* at 146, 158-59. Plaintiff was ultimately fired for the cited reason of not meeting the goals in his performance plan, despite the performance plan being a pre-text for his firing. *Id.* at 145.

Although waiver must be unequivocal, the Oregon Supreme Court reasoned that waiver can take the form of conduct or subsequent assertions that leads another person to believe that a contractual provision has been waived. *Id.* at 157-58. The court reasoned that it was defendants that waived its right to rely on the at-will provision of the original provision because defendants led plaintiff to believe that he would be fired only for good cause. *Id.* at 158-59.

Here, even if Columbia's conduct of administering the project led the Clauses to believe that the Clauses responsibilities were waived, applying *Bennett* in this case would be inapposite. The *Bennett* court held that Farmers's own conduct and assertions waived its right to rely on the at-will provision to fire plaintiff without cause. *Bennett* does not stand for the proposition that a defendant who assumes responsibilities of the plaintiff relieves the plaintiff of its obligations. Rather, *Bennett* supports the notion that a party cannot, in practice, purport to no longer rely on a contractual right and subsequently invoke that right when it sees fit.

This is not the case here. Columbia did not purport to waive its rights. As the Clauses argue, Columbia assumed the Clauses' responsibilities, which is distinct from Columbia waiving its own rights and subsequently invoking the waived right. Moreover, the assertions that led the plaintiff in *Bennett* to infer waiver occurred after the written agreement was made. Here, however,

the promise that could have led the Clauses to infer that they were no longer tied to their managerial responsibilities occurred prior to the agreement. Lastly, even if the court were to extend *Bennett* to apply to parties who waive another party's obligations, the Clauses cannot state a claim for promissory estoppel because of actual consideration and no substantial change in position. For the reasons stated, the Clauses have failed to allege sufficient facts to state a claim of promissory estoppel. Accordingly, Columbia's motion is granted with respect to the Clauses' claim of promissory estoppel.

### Leave to Amend

If the court dismisses a complaint, it must then decide whether to grant leave to amend. Discussed *supra*, leave to amend should be granted with "extreme liberality." *Eminence*, 316 F.3d at 1051. The Ninth Circuit repeatedly has held that dismissal without leave to amend is improper, even if no request to amend the pleading was made, unless it is clear that the defective pleading cannot possibly be cured by the allegation of additional facts. *Snell v. Cleveland, Inc.*, 316 F.3d 822, 828 n.6 (9th Cir. 2002) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 692 (9th Cir. 2001); *Lopez v. Smith*, 203 F.3d 1122, 1130–31 (9th Cir. 2000)).

Here, the court finds leave to amend is appropriate on the Clauses' claims for fraud, negligent misrepresentation, and breach of obligation of good faith and fair dealing, because it is possible the Clauses may be able to cure the aforementioned deficiencies in their pleading by alleging certain additional facts. Those facts must plead, with respect to the fraud claim, factual allegations supporting a reasonable inference: that Columbia's representation regarding SHB's "capitalization and creditworthiness" was false at the time Columbia made those representation, that the Clauses' reliance on that representation was reasonable, or, alternatively, how the Clauses' duty to investigate was affected such that the their reliance was reasonable. If the Clauses allege facts regarding the falsity of Columbia's representation, then those additional facts, coupled with

the facts currently alleged regarding knowledge and intent to induce, may be sufficient to state a claim for fraud.

With respect to the claim of negligent misrepresentation, it is possible for the Clauses to allege additional facts to support a special relationship. Those facts would add detail to the circumstances surrounding Columbia drafting project plans and entering into contracts on the Clauses' behalf, as this would go the recognized special relationship of principal-agent.

With respect to the claim of breach of the obligation of good faith and fair dealing, it is possible that the Clauses can plead additional facts, as discussed *supra*, that support an inference that Columbia caused the default to occur or that Columbia used an improper method of foreclosure.

The court, however, denies leave to amend with respect to the claim of breach of contract and promissory estoppel. As described above, the Clauses have failed to state a claim with respect to the above-mentioned claims, and further leave to amend is not likely to cure the deficiencies for the following reasons. With respect to the breach of contract claim, the Clauses pleaded facts indicating they did not comply with the written notice requirement. Additionally, the Clauses did not provide a legal justification for their non-performance. Regarding promissory estoppel, the Clauses pleaded that payment was made for Columbia to financially administer the development project. Because actual consideration effectively bars a claim for promissory estoppel, further amendment would not likely cure the defect.

*Conclusion*

For the reasons stated, the Clauses' Motion to Accept the Amended Complaint (ECF No. 77) is GRANTED in part. Columbia's Motion to Dismiss (ECF No. 80) is GRANTED in part. However, the dismissal is granted without prejudice and with leave to amend with respect to the claims of fraud, negligent misrepresentation, and breach of the obligation of good faith and fair

dealing. The dismissal is granted with prejudice with respect to the claims of breach of contract and promissory estoppel.

IT IS SO ORDERED.

DATED this _30th_ day of October, 2019.

JOHN V. ACOSTA
United States Magistrate Judge